(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MARACICH ET AL. *v.* SPEARS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 12–25.   Argued January 9, 2013—Decided June 17, 2013

Respondent attorneys submitted several state Freedom of Information Act (FOIA) requests to the South Carolina DMV, seeking names and addresses of thousands of individuals in order to solicit clients for a lawsuit they had pending against several South Carolina car dealerships for violation of a state law that protects car purchasers from dealership actions that are "arbitrary, in bad faith, or unconscionable."  Using the personal information provided by the DMV, respondents sent over 34,000 car purchasers letters, which were headed "ADVERTISING MATERIAL," explained the lawsuit, and asked recipients to return an enclosed reply card if they wanted to participate in the case.  Petitioners, South Carolina residents, sued respondents for violating the federal Driver's Privacy Protection Act of 1994 (DPPA) by obtaining, disclosing, and using petitioners' personal information from motor vehicle records for bulk solicitation without their express consent.  Respondents moved to dismiss, claiming that the information was properly released under a DPPA exception permitting disclosure of personal information "for use in connection with any civil, criminal, administrative, or arbitral proceeding," including "investigation in anticipation of litigation."  18 U. S. C. §2721(b)(4). The District Court held that respondents' letters were not solicitations and that the use of information fell within (b)(4)'s litigation exception.  The Fourth Circuit affirmed, concluding that the letters were solicitation, but that the solicitation was intertwined with conduct that satisfied the (b)(4) exception.

*Held*: An attorney's solicitation of clients is not a permissible purpose covered by the (b)(4) litigation exception. Pp. 6–29.

   (a) State DMVs generally require someone seeking a driver's license or registering a vehicle to disclose detailed personal infor-

mation such as name, address, telephone number, Social Security number, and medical information. The DPPA—responding to a threat from stalkers and criminals who could acquire state DMV information, and concerns over the States' common practice of selling such information to direct marketing and solicitation businesses— bans disclosure, absent a driver's consent, of "personal information," *e.g.,* names, addresses, or telephone numbers, as well as "highly restricted personal information," *e.g.,* photographs, social security numbers, and medical or disability information, §2725(4), unless 1 of 14 exemptions applies. Subsection (b)(4) permits disclosure of both personal information and highly restricted personal information, while subsection (b)(12) permits disclosure only of personal information. Pp. 6–8.

(b) Respondents' solicitation of prospective clients is neither a use "in connection with" litigation nor "investigation in anticipation of litigation" under (b)(4). Pp. 8–15.

(1) The phrase "in connection with" provides little guidance without a limiting principle consistent with the DPPA's purpose and its other provisions. See *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 656. Such a consistent interpretation is also required because (b)(4) is an exception to both the DPPA's general ban on disclosure of "personal information" and the ban on release of "highly restricted personal information." An exception to a general policy statement is "usually read . . . narrowly in order to preserve the [provision's] primary operation." *Commissioner* v. *Clark*, 489 U. S. 726, 739. Reading (b)(4) to permit disclosure of personal information when there is any connection between protected information and a potential legal dispute would substantially undermine the DPPA's purpose of protecting a right to privacy in motor vehicle records. Subsection (b)(4)'s "in connection with" language must have a limit, and a logical and necessary conclusion is that an attorney's solicitation of prospective clients falls outside of that limit. Pp. 9–11.

(2) An attorney's solicitation of new clients is distinct from an attorney's conduct on behalf of his client or the court. Solicitation "by a lawyer of remunerative employment is a business transaction," *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 457, and state bars treat solicitation as discrete professional conduct. Excluding solicitation from the meaning of "in connection with" litigation draws support from (b)(4)'s examples of permissible litigation uses—"service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders"—which all involve an attorney's conduct as an officer of the court, not a commercial actor. Similarly, "investigation in anticipation of litigation" is best understood to

allow background research to determine if there is a supportable theory for a complaint or a theory sufficient to avoid sanctions for filing a frivolous lawsuit, or to help locate witnesses for deposition or trial. Pp. 11–14.

(3) This reading is also supported by the fact that (b)(4) allows use of the most sensitive personal information. Permitting its use in solicitation is so substantial an intrusion on privacy it must not be assumed, without clear and explicit language, absent here, that Congress intended to exempt attorneys from DPPA liability in this regard. Pp. 14–15.

(c) Limiting (b)(4)'s reach also respects the statutory purpose and design evident in subsection (b)(12), which allows solicitation only of persons who have given express consent to have their names and addresses disclosed for this purpose. Subsection (b)(12) implements an important objective of the DPPA—to restrict disclosure of personal information in motor vehicle records to businesses for the purpose of direct marketing and solicitation. Other exceptions should not be construed to interfere with this objective unless the text commands it. Reading (b)(4)'s "in connection with" phrase to include solicitation would permit an attorney to use personal information from the state DMV to send bulk solicitations to prospective clients without their express consent, thus creating significant tension between the DPPA's litigation and solicitation exceptions. Pp. 15–19.

(d) Such a reading of (b)(4) could also affect the interpretation of the (b)(6) exception, which allows an insurer and certain others to obtain DMV information for use "in connection with . . . underwriting," and the (b)(10) exception, which permits disclosure and use of personal information "in connection with" the operation of private toll roads. Pp. 19–20.

(e) Respondents contend that a line can be drawn between mere trolling for clients and their solicitation, which was tied to a specific legal dispute, but that is not a tenable distinction. The DPPA supports drawing the line at solicitation. Solicitation can aid an attorney in bringing a lawsuit or increasing its size, but the question is whether or not lawyers can use personal information protected under the DPPA for this purpose. The mere fact that respondents complied with state bar rules governing solicitations also does not resolve whether they were entitled to access personal information from the state DMV database for that purpose. In determining whether obtaining, using, or disclosing personal information is for the prohibited purpose of solicitation, the proper inquiry is whether the defendant's purpose was to solicit, which might be evident from the communication itself or from the defendant's course of conduct. When that is the predominant purpose, (b)(4) does not entitle attorneys to DPPA-

protected information even when solicitation is to aggregate a class action. Attorneys also have other alternatives to aggregate a class, including, *e.g.* soliciting plaintiffs through traditional and permitted advertising. And they may obtain DPPA-protected information for a proper investigative use.

Although the Fourth Circuit held that the letters here were solicitations, it found the communications nonetheless exempt under (b)(4) because they were "inextricably intertwined" with permissible litigation purposes. If however, the use of DPPA-protected personal information has the predominant purpose of solicitation, it would not be protected by (b)(4). A remand is necessary for the court to apply the proper standard to determine the predominant purpose of respondents' letters. Pp. 20–26.

(f) There is no work for the rule of lenity to do here, because the DPPA's text and structure resolve any ambiguity in (b)(4)'s phrases "in connection with" and "investigation in anticipation of litigation." Pp. 26–27.

(g) On remand, the courts below must determine whether respondents' letters, viewed objectively, had the predominant purpose of solicitation, and may address whether respondents' conduct was permissible under (b)(1)'s governmental-function exception and any other defenses that have been properly preserved. Pp. 27–29.

675 F. 3d 281, vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, and ALITO, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which SCALIA, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–25

EDWARD F. MARACICH, ET AL., PETITIONERS *v.*
MICHAEL EUGENE SPEARS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2013]

JUSTICE KENNEDY delivered the opinion of the Court.

Concerned that personal information collected by States in the licensing of motor vehicle drivers was being released—even sold—with resulting loss of privacy for many persons, Congress provided federal statutory protection. It enacted the Driver's Privacy Protection Act of 1994, referred to here as the DPPA.  See 18 U. S. C. §§2721–2725.

The DPPA regulates the disclosure of personal information contained in the records of state motor vehicle departments (DMVs).  Disclosure of personal information is prohibited unless for a purpose permitted by an exception listed in 1 of 14 statutory subsections.  See §§2721(b)(1)–(14).  This case involves the interpretation of one of those exceptions, subsection (b)(4).  The exception in (b)(4) permits obtaining personal information from a state DMV for use "in connection with" judicial and administrative proceedings, including "investigation in anticipation of litigation."  §2721(b)(4).  The question presented is whether an attorney's solicitation of clients for a lawsuit falls within the scope of (b)(4).

Respondents are trial lawyers licensed to practice in South Carolina. They obtained names and addresses of thousands of individuals from the South Carolina DMV in order to send letters to find plaintiffs for a lawsuit they had filed against car dealers for violations of South Carolina law. Petitioners, South Carolina residents whose information was obtained and used without their consent, sued respondents for violating the DPPA. Respondents claimed the solicitation letters were permitted under subsection (b)(4). In light of the text, structure, and purpose of the DPPA, the Court now holds that an attorney's solicitation of clients is not a permissible purpose covered by the (b)(4) litigation exception.

I

A

The State of South Carolina, to protect purchasers of motor vehicles, enacted the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act (MDDA). In June 2006, respondent attorneys were approached by car purchasers who complained about administrative fees charged by car dealerships in certain South Carolina counties, allegedly in violation of the MDDA. The state statute prohibits motor vehicle dealers from engaging in "any action which is arbitrary, in bad faith, or unconscionable and which causes damage to any of the parties or to the public." S. C. Code Ann. §56–15–40(1) (2006). The MDDA provides that "one or more may sue for the benefit of the whole" where an action is "one of common or general interest to many persons or when the parties are numerous and it is impracticable to bring them all before the court." §56–15–110(2).

On June 23, 2006, one of the respondent attorneys submitted a state Freedom of Information Act (FOIA) request to the South Carolina DMV to determine if charging illegal administrative fees was a common practice so

that a lawsuit could be brought as a representative action under the MDDA. The attorney's letter to the DMV requested information regarding "[p]rivate purchases of new or used automobiles in Spartanburg County during the week of May 1–7, 2006, including the name, address, and telephone number of the buyer, dealership where purchased, type of vehicle purchased, and date of purchase." App. 57. The letter explained that the request was made "in anticipation of litigation . . . pursuant to the exception in 18 USC §2721(b)(4) of the Driver's Privacy Protection Act." *Ibid.* The South Carolina DMV provided the requested information. On August 24, 2006, respondents submitted a second FOIA request to the DMV, also asserting that it was made "in anticipation of litigation . . . pursuant to the exception in 18 USC §2721(b)(4)," for car purchasers in five additional counties during the same week. *Id.*, at 67.

On August 29, 2006, respondents filed suit in South Carolina state court on behalf of four of the consumers who originally contacted them. The case is referred to here, and by the parties, as the *Herron* suit. The complaint in the *Herron* suit named 51 dealers as defendants and invoked the MDDA's "group action" provision to assert claims "for the benefit of all South Carolina car buyers wh[o] paid administrative fees," *id.*, at 128, to those dealers during the same time period.

Some of the dealer defendants in the *Herron* suit filed motions to dismiss for lack of standing because none of the named plaintiffs purchased cars from them. On October 26, 2006, while the motions to dismiss were pending, respondents submitted a new FOIA request to the South Carolina DMV. That request, again citing subsection (b)(4) of the DPPA, sought to locate additional car buyers who could serve as plaintiffs against the dealers who had moved to dismiss. On October 31, 2006, respondents filed an amended complaint, which added four named plaintiffs

and increased the number of defendant dealers from 51 to
324. As before, defendant dealerships that had not en-
gaged in transactions with any of the now eight named
plaintiffs filed motions to dismiss for lack of standing.

On January 3, 2007, using the personal information
they had obtained from the South Carolina DMV, re-
spondents sent a mass mailing to find car buyers to serve
as additional plaintiffs in the litigation against the deal-
ers. Later in January, respondents made three more
FOIA requests to the South Carolina DMV seeking per-
sonal information concerning people who had purchased
cars from an additional 31 dealerships, again citing the
(b)(4) exception. The South Carolina DMV granted all the
requests. On January 23, respondents mailed a second
round of letters to car buyers whose personal information
had been disclosed by the DMV. Respondents sent addi-
tional rounds of letters on March 1, March 5, and May 8.
Each of the five separate mailings was sent to different
recipients. In total, respondents used the information
obtained through their FOIA requests to send letters to
over 34,000 car purchasers in South Carolina. This opin-
ion refers to the communications sent by respondents
simply as the "letters."

The letters, all essentially the same, had the heading
"ADVERTISING MATERIAL." The letters explained the
lawsuit against the South Carolina dealers and asked
recipients to contact the respondent-lawyers if interested
in participating in the case. Attached to the letter was a
reply card that asked a few questions about the recipient's
contact information and car purchase and ended with the
sentence "I am interested in participating" followed by a
signature line. The text of the letter and reply are set out
in full in the Appendix, *infra.*

In accordance with South Carolina Rule of Professional
Conduct 7.3 (2012), which regulates the solicitation of
prospective clients, respondents filed a copy of the letter

and a list of recipients' names and addresses with the South Carolina Office of Disciplinary Counsel.

In June 2007, respondents sought to amend their complaint to add 247 plaintiffs. The court denied leave to amend and held the named plaintiffs had standing to sue only those dealerships from which they had purchased automobiles and any alleged co-conspirators. In September 2007, respondents filed two new lawsuits on behalf of the additional car buyers. Those subsequent cases were consolidated with the *Herron* suit. All claims against dealerships without a corresponding plaintiff-purchaser were dropped.

B

In the case now before the Court, petitioners are South Carolina residents whose personal information was obtained by respondents from the South Carolina DMV and used without their consent to send solicitation letters asking them to join the lawsuits against the car dealerships. Petitioner Edward Maracich received one of the letters in March 2007. While his personal information had been disclosed to respondents because he was one of many buyers from a particular dealership, Maracich also happened to be the dealership's director of sales and marketing. Petitioners Martha Weeks and John Tanner received letters from respondents in May 2007. In response to the letter, Tanner called Richard Harpootlian, one of the respondent attorneys listed on the letter. According to Tanner, Harpootlian made an aggressive sales pitch to sign Tanner as a client for the lawsuit without asking about the circumstances of his purchase.

In 2009, petitioners filed the instant putative class-action lawsuit in the United States District Court for the District of South Carolina. The complaint alleged that respondents had violated the DPPA by obtaining, disclosing, and using personal information from motor vehicle

records for bulk solicitation without the express consent of petitioners and the other class members.

Respondents moved to dismiss. The information, they contended, was subject to disclosure because it falls within two statutory exceptions in the DPPA: (b)(1), pertaining to governmental functions, and (b)(4), pertaining to litigation. On cross-motions for summary judgment, the District Court held as a matter of law that respondents' letters were not solicitations and that the use of information fell within the (b)(4) litigation exception. App. to Pet. for Cert. 61a. The District Court also found that respondents' use of personal information was permitted under the (b)(1) governmental-function exception.

The Court of Appeals for the Fourth Circuit affirmed. Unlike the District Court, it found that the letters were "solicitation[s]" within the meaning of the DPPA; but it held further that when "solicitation is an accepted and expected element of, and is inextricably intertwined with, conduct satisfying the litigation exception under the DPPA, such solicitation is not actionable." 675 F. 3d 281, 284 (2012). This Court granted certiorari to address whether the solicitation of clients is a permissible purpose for obtaining personal information from a state DMV under the DPPA's (b)(4) exception. 567 U. S. ___ (2012).

II

To obtain a driver's license or register a vehicle, state DMVs, as a general rule, require an individual to disclose detailed personal information, including name, home address, telephone number, Social Security number, and medical information. See *Reno* v. *Condon*, 528 U. S. 141, 143 (2000). The enactment of the DPPA responded to at least two concerns over the personal information contained in state motor vehicle records. The first was a growing threat from stalkers and criminals who could acquire personal information from state DMVs. The

second concern related to the States' common practice of selling personal information to businesses engaged in direct marketing and solicitation. To address these concerns, the DPPA "establishes a regulatory scheme that restricts the States' ability to disclose a driver's personal information without the driver's consent." *Id.*, at 144.

The DPPA provides that, unless one of its exceptions applies, a state DMV "shall not knowingly disclose or otherwise make available" "personal information" and "highly restricted personal information." §§2721(a)(1)–(2). "[P]ersonal information" is "information that identifies an individual, including [a] . . . driver identification number, name, address . . . , [or] telephone number, . . . but does not include information on vehicular accidents, driving violations, and driver's status." §2725(3). "[H]ighly restricted personal information" is defined as "an individual's photograph or image, social security number, [and] medical or disability information." §2725(4). The DPPA makes it unlawful "for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." §2722(a). A person "who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains." §2724(a).

The DPPA's disclosure ban is subject to 14 exceptions set forth in §2721(b), for which personal information "may be disclosed." The two exceptions most relevant for the purpose of this case are the litigation exception in subsection (b)(4) and the solicitation exception in (b)(12).

The (b)(4) litigation exception is one of the four provisions permitting disclosure not only of personal information but also of highly restricted personal information. §2721(b)(4); §2725(4). It provides that information may be disclosed:

"For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court."

The (b)(12) solicitation exception provides that certain personal information, not including highly restricted personal information, may be disclosed:

"For bulk distribution for surveys, marketing, or solicitations if the State has obtained the express consent of the person to whom such personal information pertains."

The solicitation exception was originally enacted as an opt-out provision, allowing state DMVs to disclose personal information for purposes of solicitation only if the DMV gave individuals an opportunity to prohibit such disclosures. §2721(b)(12) (1994 ed.). In 1999, Congress changed to an opt-in regime, requiring a driver's affirmative consent before solicitations could be sent. See *Condon*, *supra*, at 144–145.

## III

Respondents' liability depends on whether their use of personal information acquired from the South Carolina DMV to solicit clients constitutes a permissible purpose under the DPPA. The District Court held that respondents' conduct was permissible both under the (b)(1) and (b)(4) exceptions. The Court of Appeals ruled that the conduct here was permissible under (b)(4); but, unlike the District Court, it did not address the alternative argument that the conduct was also permissible under (b)(1). As in the Court of Appeals, only the (b)(4) exception is discussed here.

A

Respondents claim they were entitled to obtain and use petitioners' personal information based on two of the phrases in (b)(4). First, disclosure of personal information is permitted for use "in connection with any civil, criminal, administrative, or arbitral proceeding." §2721(b)(4). Second, a use in connection with litigation includes "investigation in anticipation of litigation." *Ibid.* Respondents contend that the solicitation of prospective clients, especially in the circumstances of this case, is both a use "in connection with" litigation and "investigation in anticipation of litigation."

1

If considered in isolation, and without reference to the structure and purpose of the DPPA, (b)(4)'s exception allowing disclosure of personal information "for use in connection with any civil, criminal, administrative, or arbitral proceeding," and for "investigation in anticipation of litigation," is susceptible to a broad interpretation. That language, in literal terms, could be interpreted to its broadest reach to include the personal information that respondents obtained here. But if no limits are placed on the text of the exception, then all uses of personal information with a remote relation to litigation would be exempt under (b)(4). The phrase "in connection with" is essentially "indeterminat[e]" because connections, like relations, "'stop nowhere.'" *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655 (1995). So the phrase "in connection with" provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions. See *id.,* at 656 ("We simply must go beyond the unhelpful text and the frustrating difficulty of defining ['connection with'], and look instead to the objectives of the ERISA statute"); see also *California Div. of Labor Stand-*

*ards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519
U. S. 316, 335 (1997) ("But applying the 'relate to' provi-
sion according to its terms was a project doomed to failure,
since, as many a curbstone philosopher has observed,
everything is related to everything else").

An interpretation of (b)(4) that is consistent with the
statutory framework and design is also required because
(b)(4) is an exception to both the DPPA's general prohibi-
tion against disclosure of "personal information" and its
ban on release of "highly restricted personal information."
§§2721(a)(1)–(2). An exception to a "general statement of
policy" is "usually read . . . narrowly in order to preserve
the primary operation of the provision." *Commissioner* v.
*Clark*, 489 U. S. 726, 739 (1989). It is true that the
DPPA's 14 exceptions permit disclosure of personal infor-
mation in a range of circumstances. Unless commanded
by the text, however, these exceptions ought not operate to
the farthest reach of their linguistic possibilities if that
result would contravene the statutory design. Cf. *Cowan*
v. *Ernest Codelia, P. C.,* 149 F. Supp. 2d 67 (SDNY 2001)
(rejecting an argument by defense counsel that obtaining
from the DMV the home address of the assistant district
attorney to send her a harassing letter was a permissible
use "in connection with" the ongoing criminal proceeding
under (b)(4)).

If (b)(4) were read to permit disclosure of personal in-
formation whenever any connection between the protected
information and a potential legal dispute could be shown,
it would undermine in a substantial way the DPPA's
purpose of protecting an individual's right to privacy in his
or her motor vehicle records. The "in connection with"
language in (b)(4) must have a limit. A logical and neces-
sary conclusion is that an attorney's solicitation of pro-
spective clients falls outside of that limit.

The proposition that solicitation is a distinct form of
conduct, separate from the conduct in connection with

litigation permitted under (b)(4) is demonstrated: by the words of the statute itself; by formal rules issued by bar organizations and governing boards; and by state statutes and regulations that govern and direct attorneys with reference to their duties in litigation, to their clients, and to the public. As this opinion explains in more detail, the statute itself, in (b)(12), treats bulk solicitation absent consent as a discrete act that the statute prohibits. And the limited examples of permissible litigation purposes provided in (b)(4) are distinct from the ordinary commercial purpose of solicitation. Canons of ethics used by bar associations treat solicitation as a discrete act, an act subject to specific regulation. And state statutes, including statutes of the State of South Carolina, treat solicitation as a discrete subject for regulation and governance of the profession. It would contradict the idea that solicitation is defined conduct apart from litigation to treat it as simply another aspect of the litigation duties set out in (b)(4).

2

An attorney's solicitation of new clients is distinct from other aspects of the legal profession. "It is no less true than trite that lawyers must operate in a three-fold capacity, as self-employed businessmen as it were, as trusted agents of their clients, and as assistants to the court in search of a just solution to disputes." *Cohen* v. *Hurley*, 366 U. S. 117, 124 (1961), overruled on other grounds, *Spevack* v. *Klein*, 385 U. S. 511 (1967). Unlike an attorney's conduct performed on behalf of his client or the court, "solicitation by a lawyer of remunerative employment is a business transaction." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 457 (1978); see also *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 637 (1985) (attorney solicitation "'propose[s] a commercial transaction'"). The "pecuniary motivation of the lawyer

who solicits a particular representation" may even "create
special problems of conflict of interest." *Ohralik*, *supra*, at
461, n. 19.

The distinction between solicitation and an attorney's
other duties is also recognized and regulated by state bars
or their governing bodies, which treat solicitation as dis-
crete professional conduct. See, *e.g.*, Cal. Rule Prof. Con-
duct 1–400 (2013); N. Y. Rule Prof. Conduct 7.3 (2012–
2013); Tex. Disciplinary Rules Prof. Conduct 7.02–7.03
(2013); Va. Rule Prof. Conduct 7.3 (Supp. 2012). That,
indeed, was true here. Respondents were required by the
South Carolina rules of ethics to include certain language
in their solicitation letters and to file copies with the
South Carolina Office of Disciplinary Counsel. See S. C.
Rule Prof. Conduct 7.3. Given the difference between an
attorney's commercial solicitation of clients and his duties
as an officer of the court, the proper reading of (b)(4) is
that solicitation falls outside of the litigation exception.
And when (b)(4) is interpreted not to give attorneys the
privilege of using protected personal information to pro-
pose a commercial transaction, the statute is limited by
terms and categories that have meaning in the regular
course of professional practice.

The exclusion of solicitation from the meaning of "in
connection with" litigation draws further support from the
examples of permissible litigation uses in (b)(4). The
familiar canon of *noscitur a sociis*, the interpretive rule
that "words and people are known by their companions,"
*Gutierrez* v. *Ada*, 528 U. S. 250, 255 (2000), provides in-
struction in this respect. Under this rule, the phrases "in
connection with" and "investigation in anticipation of
litigation," which are "capable of many meanings," *Jarecki*
v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961), can be
construed in light of their accompanying words in order to
avoid giving the statutory exception "unintended breadth,"
*ibid.*; see also *United States* v. *Williams*, 553 U. S. 285,

294 (2008) (the canon of *noscitur a sociis* "counsels that a word is given more precise content by the neighboring words with which it is associated").

The examples of uses "in connection with" litigation that Congress provided in (b)(4) include "the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court." §2721(b)(4). These uses involve an attorney's conduct when acting in the capacity as an officer of the court, not as a commercial actor. The listed examples are steps that ensure the integrity and efficiency of an existing or imminent legal proceeding. This may include contacting persons who are already involved in the litigation or who are necessary parties or witnesses. These steps are different from the ordinary business purpose of solicitation. Here, as will be the case for most solicitations, the attorneys acted without court authorization or supervision and cast a wide net, sending letters to over 30,000 car purchasers to let them know the attorneys' names and the attorneys' interest in performing legal services for them.

The examples in (b)(4) confirm, and are all consistent with, protecting the professional responsibilities that counsel, or the court, must discharge in the proper conduct of litigation. These are quite distinct from the separate subject, the separate professional conduct, of soliciting clients. The examples suggest that the litigation exception has a limited scope to permit the use of highly restricted personal information when it serves an integral purpose in a particular legal proceeding. In light of the types of conduct permitted by the subsection, the "in connection with" language should not be read to include commercial solicitations by an attorney.

Similarly, "investigation in anticipation of litigation" is best understood to allow background research to determine whether there is a supportable theory for a com-

plaint, a theory sufficient to avoid sanctions for filing a
frivolous lawsuit, or to locate witnesses for deposition or
trial testimony. An interpretation of "investigation" to
include commercial solicitation of new clients would ex-
pand the language in a way inconsistent with the limited
uses given as examples in the statutory text. It must be
noted also that the phrase "in anticipation of litigation" is
not a standalone phrase. It modifies, and necessarily
narrows, the word "investigation." To use the phrase "in
anticipation of litigation" without that qualification is to
extend the meaning of the statute far beyond its text.

3

An additional reason to hold that (b)(4) does not permit
solicitation of clients is because the exception allows use of
the most sensitive kind of information, including medical
and disability history and Social Security numbers. To
permit this highly personal information to be used in
solicitation is so substantial an intrusion on privacy it
must not be assumed, without language more clear and
explicit, that Congress intended to exempt attorneys from
DPPA liability in this regard.

Subsection (b)(4) is one of only four exceptions in the
statute that permit disclosure of "highly restricted personal
information," including a person's image, Social Security
number, and medical and disability information. See
§2721(a)(2); §2725(4). The other three exceptions that
permit access to highly restricted personal information
include: use by the government, including law enforce-
ment, see §2721(b)(1); use by an insurer in claim investi-
gation and antifraud activities, see §2721(b)(6); and use by
an employer to obtain or verify information as required by
law, see §2721(b)(9). None of these exceptions are written
to authorize private individuals to acquire the most re-
stricted personal information in bulk merely to propose a
commercial transaction for their own financial benefit. If

(b)(4) permitted access to highly restricted personal infor-
mation for an attorney's own commercial ends with-
out governmental authorization or without consent of
the holder of the driver's license, the result would be so sig-
nificant a departure from these other exceptions that
it counsels against adopting this interpretation of the
statute.

While the (b)(4) exception allows this sensitive infor-
mation to be used for investigation in anticipation of
litigation and in the litigation itself, there is no indication
Congress wanted to provide attorneys with a special con-
cession to obtain medical information and Social Security
numbers for the purpose of soliciting new business.

## B

Limiting the reach of (b)(4) to foreclose solicitation of
clients also respects the statutory design of the DPPA.
The use of protected personal information for the purpose
of bulk solicitation is addressed explicitly by the text of
(b)(12). Congress was aware that personal information
from motor vehicle records could be used for solicitation,
and it permitted it in circumstances that it defined, with
the specific safeguard of consent by the person contacted.
So the absence of the term "solicitation" in (b)(4) is telling.
Subsection (b)(12) allows solicitation only of those persons
who have given express consent to have their names and
addresses disclosed for this purpose. If (b)(4) were to be
interpreted to allow solicitation without consent, then the
structure of the Act, and the purpose of (b)(12), would be
compromised to a serious degree.

It is necessary and required that an interpretation of a
phrase of uncertain reach is not confined to a single sen-
tence when the text of the whole statute gives instruction
as to its meaning. *United States Nat. Bank of Ore.* v.
*Independent Ins. Agents of America, Inc.*, 508 U. S. 439,
455 (1993) ("'[I]n expounding a statute, we must not be

guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy'" (quoting *United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849))). The "in connection with" language of (b)(4) therefore must be construed within the context of the DPPA as a whole, including its other exceptions.

This is not to say, as petitioners contend, that this is a straightforward application of the specific (qualified solicitation permission in (b)(12)) controlling the general (the undefined reach of "in connection with" and "investigation in anticipation of litigation" in (b)(4)). As between the two exceptions at issue here, it is not clear that one is always more specific than the other. For while (b)(12) is more specific with respect to solicitation, (b)(4) is more specific with respect to litigation. The DPPA's 14 permissible use exceptions, moreover, are not in all contexts mutually exclusive. The better reading is that each exception addresses different conduct which may, on occasion, overlap. For example, certain uses of personal information by a court may be exempt either under (b)(1) or (b)(4). If conduct falls within the explicit or unambiguous scope of one exception, all other potentially applicable exceptions need not be satisfied.

So the question is not which of the two exceptions controls but whether respondents' conduct falls within the litigation exception at all. As to this question, petitioners are correct that the existence of the separate provision governing solicitation provides necessary context for defining the scope of (b)(4). As discussed above, the text of (b)(4) indicates that the exception is best read not to include solicitation as a use "in connection with" litigation. But even if there were any doubt on this point, the statutory design of the DPPA as a whole, including the (b)(12) exception governing solicitations, provides additional instruction for construing this provision. For this reason, it is relevant that "'Congress has enacted a comprehensive

scheme and has deliberately targeted specific problems with specific solutions.'" *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 566 U. S.___, ___ (2012) (slip op., at 5).

Subsection (b)(12) implements an important objective of the DPPA—to restrict disclosure of personal information contained in motor vehicle records to businesses for the purpose of direct marketing and solicitation. The DPPA was enacted in part to respond to the States' common practice of selling personal information to businesses that used it for marketing and solicitations. See *Condon*, 528 U. S., at 143 ("Congress found that many States . . . sell this personal information to individuals and businesses"); *id.*, at 148 ("The motor vehicle information which the States have historically sold is used by insurers, manufacturers, direct marketers, and others engaged in interstate commerce to contact drivers with customized solicitations"). Congress chose to protect individual privacy by requiring a state DMV to obtain the license holder's express consent before permitting the disclosure, acquisition, and use of personal information for bulk solicitation. The importance of the consent requirement is highlighted by Congress' decision in 1999 to change the statutory mechanism that allowed individuals protected by the Act to opt out to one requiring them to opt in. See *id.*, at 144–145; see also §§350(c)–(e), 113 Stat. 1025.

Direct marketing and solicitation present a particular concern not only because these activities are of the ordinary commercial sort but also because contacting an individual is an affront to privacy even beyond the fact that a large number of persons have access to the personal information. The DPPA's (b)(5) exception illustrates this concern by permitting disclosure of personal information for use in research activities "so long as the personal information is not published, redisclosed, or used to contact individuals." §2721(b)(5).

Because (b)(12) represents Congress' decision to target the problem of bulk solicitation with the requirement of express consent, other exceptions should not be construed to interfere with this statutory mechanism unless the text commands it. This is not to suggest that (b)(12) is an overriding rule that controls all other exceptions. It would not be necessary to consider (b)(12) if another statutory exception applied to the relevant conduct. The relevance of (b)(12), however, is that it can be used as additional evidence of the DPPA's statutory design to interpret exceptions whose breadth and application are uncertain.

Here, the phrase "in connection with" litigation in the (b)(4) exception, as a matter of normal usage and common understanding, does not encompass an attorney's commercial use of DPPA-protected personal information to solicit new clients. This and the other reasons given above lead to the conclusion that it would be incorrect to interpret the text of this exception to include an attorney's commercial solicitation as a use "in connection with" litigation. And, unlike (b)(12), the (b)(4) exception does not require obtaining an individual's express consent before disclosing and using personal information contained in state motor vehicle records. If the "in connection with" language of (b)(4) were read broadly to include solicitation, an attorney could acquire personal information from the state DMV to send bulk solicitations to prospective clients without their express consent. This would create significant tension in the DPPA between the litigation and solicitation exceptions. That inconsistency and the concomitant undermining of the statutory design are avoided by interpreting (b)(4) so it does not authorize the use of personal information for the purpose of soliciting clients. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory. . . . [T]here can be no justification for need-

lessly rendering provisions in conflict if they can be inter-
preted harmoniously").

## C

If the phrase "in connection with" in (b)(4) included
solicitation by lawyers, then a similar reach for that
phrase could apply to other exceptions, resulting in fur-
ther frustration of the Act's design. Subsection (b)(6)
allows an insurer and certain other parties to obtain DMV
information for use "in connection with . . . underwriting."
§2721(b)(6). If that phrase extended to solicitation, then
personal information protected by the DPPA could be used
to solicit new customers for underwriting without their
consent. It is most doubtful that Congress intended to
exempt insurers from the consent requirement for bulk
solicitations.

The DPPA, in subsection (b)(10), permits disclosure and
use of personal information "in connection with" the oper-
ation of private toll roads. If the phrase were interpreted
to extend to all solicitations without consent, then the
owner of a private toll road could send targeted mass
advertisings or direct marketing letters by using the
protected personal information obtained from state motor
vehicle records. This, too, would take away much of the
force and effect of the (b)(12) restriction on bulk solicita-
tion without the express consent of the person contacted.

When Congress did intend the phrase "in connection
with" to permit conduct otherwise subject to the express
consent requirement in (b)(12), it did so in explicit terms.
An illustration can be found in the interplay between
(b)(2) and (b)(12) of the DPPA. As has been noted, (b)(12)
prohibits disclosure of protected personal information for
the purpose of sending bulk distribution of surveys with-
out the express consent of the recipients. Subsection
(b)(2), however, permits disclosure of personal information
"[f]or use in connection with matters of . . . motor vehicle

market research activities, including survey research."
§2721(b)(2). So what the DPPA prohibits in (b)(12) it
explicitly allows in (b)(2), but it does so by repeating the
same word, "survey," in the text of both provisions. If the
"in connection with" language alone were sufficient to
include "surveys" within (b)(2), the phrase "survey re-
search" would be mere surplusage. Instead, the explicit
reference to "survey" in (b)(2) was necessary to make clear
that Congress had created an exception to the (b)(12)'s
consent requirement for one particular type of survey.
When it comes to the prohibition on "solicitations" in
(b)(12), however, that word is not repeated in the text of
(b)(4). This leads to the inference that Congress did not
intend (b)(4) to include "solicitations" and thus to override
the express consent requirement of (b)(12).

IV

A

Respondents concede that (b)(4) does not permit attor-
neys to use personal information acquired from a state
DMV to find new business in the absence of any connec-
tion to a particular transaction, occurrence, or defect.
They contend, however, that a line can be drawn between
mere trolling for clients (which is not permitted) and
solicitation tied to a specific legal dispute (which, respond-
ents argue, is permitted). While some solicitations may
have a close relationship with existing proceedings, there
is no principled way to classify some solicitations as ac-
ceptable and others as unacceptable for the purpose of
(b)(4). Even if solicitation were permitted only after a
lawyer has a client or filed a lawsuit, attorneys would be
able to circumvent this limitation with ease by the simple
device of filing a placeholder lawsuit. All an attorney
would need is one friend or family member as his client
before being able to gain access to DPPA-protected per-
sonal information to solicit persons to fill in as plaintiffs.

Solicitation of new plaintiffs to keep defendants in a lawsuit that would otherwise be dismissed for lack of standing is no different in substance from solicitation to initiate a lawsuit. Here, at any rate, the state court found that plaintiffs had standing to sue the dealerships from which they had purchased automobiles and any alleged co-conspirators. See 675 F. 3d, at 287, n. 3. This can undermine the argument that solicitation of additional plaintiffs was somehow necessary for the lawsuit to continue.

Drawing the line between solicitations related to an existing proceeding and those that are not is not a tenable distinction. The proper solution is to draw the line at solicitation itself. The structure of the DPPA supports this distinction. If solicitation were deemed a permissible purpose under (b)(4), even when limited to a particular lawsuit, tension would remain between the (b)(12) solicitation exception, which requires express consent, and the (b)(4) litigation exception, which does not. The two statutory provisions are consistent if solicitation is excluded from the activity permitted in (b)(4).

Of course solicitation can aid an attorney in bringing a lawsuit or in increasing its size. The question, however, is whether or not lawyers can use personal information protected under the DPPA for this purpose. Petitioners and other state residents have no real choice but to disclose their personal information to the state DMV, including highly restricted personal information. The use of that information by private actors to send direct commercial solicitations without the license holder's consent is a substantial intrusion on the individual privacy the Act protects. For the reasons already discussed, a proper interpretation of a use "in connection with" litigation under (b)(4) in light of the DPPA's text and structure does not include solicitation.

The fact that an attorney complies with state bar rules governing solicitations also does not resolve whether he is

entitled to access the state DMV database for that purpose
under the DPPA. There is no provision of South Carolina
law that either permits or requires attorneys to use DPPA-
protected information to solicit potential clients. Even if
such a provision existed, under the Supremacy Clause, it
would not protect respondents from DPPA liability unless
their conduct fell within one of the Act's exceptions.

A person is liable under the DPPA if he "knowingly
obtains, discloses or uses personal information, from a
motor vehicle record, for a purpose not permitted" by one
of the statutory exceptions. §2724(a). In determining
whether obtaining, using, or disclosing the personal in-
formation is for the prohibited purpose of solicitation, the
proper inquiry is whether the defendant had the predomi-
nant purpose to solicit. Because, in some cases, a commu-
nication sent with DPPA-protected information may serve
more than one objective, a court must discern whether
solicitation is its predominant purpose. That purpose
might be evident from the communication itself. In other
instances the defendant's whole course of conduct will be
relevant in determining whether solicitation was the
predominant purpose of the act alleged to be wrongful.

Close cases may arise. Where a communication seeks to
provide class notice or locate a witness, for example, the
fact that the attorney provides contact information for a
reply likely would not make the communication an im-
proper solicitation. And the fact that a letter follows the
state bar rules governing attorney solicitations, although
relevant, will not be dispositive. For example, if the pre-
dominant purpose of a letter was not to solicit a new cli-
ent, but rather to ask a witness investigatory questions or
to secure her testimony at trial, adherence to state bar
solicitation rules would not subject the sender to DPPA
liability. Subsequent conduct, in some cases, may show
that solicitation in fact was the predominant purpose of an
earlier act; and, of course, even if an initial request was

proper, a later use may be a violation. Where a reasonable observer could discern that the predominant purpose of obtaining, using, or disclosing protected personal information was to initiate or propose a business transaction with a prospective client, (b)(4) does not exempt the solicitation.

Respondents contend that even if solicitation of clients is impermissible as a general rule, solicitation to aggregate a class action suit is permitted under (b)(4). Where the predominant purpose is solicitation, however, (b)(4) does not entitle attorneys to obtain and use DPPA-protected information. To the extent the solicitation of plaintiffs can help attorneys bring a larger class action, there are alternatives that do not sacrifice an individual's privacy in his or her motor vehicle records. An attorney, pursuant to a court order, could send class notice. Class notice may prompt a class member to join the lawsuit, but it also serves the important purpose of protecting the rights of absent class members and ensures that any decision will be binding on the class. Class notice sent on the instruction of the court also does not raise the same concerns that attorneys are acting only in their own commercial interest. But respondents here did not obtain or use the protected personal information to send class notices or comply with a court order. The letters made no mention of ethical obligations to outstanding group members or the consequences of not joining the suit. As the Court of Appeals noted, respondents "failed to indicate to recipients that they may already be *de facto* clients of the Lawyers, that is, persons whose interests were already protected by the senders." 675 F. 3d, at 293. Had respondents received a court order, they might have been able to rely on the explicit language in (b)(4) permitting uses of information "pursuant to an order of a Federal, State, or local court." §2721(b)(4). But because respondents had no court order authorizing their conduct, this

opinion need not address whether it would be proper for a court to order attorneys to obtain DPPA-protected personal information to solicit plaintiffs.

Attorneys are free to solicit plaintiffs through traditional and permitted advertising without obtaining personal information from a state DMV. Here, the attorneys could also have complied with (b)(12) and limited their solicitation to those individuals who had expressly consented, or respondents could have requested consent through the DPPA's waiver procedure. See §2721(d).

In light of these and other alternatives, attorneys are not without the necessary means to aggregate a class of plaintiffs. What they may not do, however, is to acquire highly restricted personal information from state DMV records to send bulk solicitations without express consent from the targeted recipients.

This is not to suggest that attorneys may not obtain DPPA-protected personal information for a proper investigatory purpose. Where respondents obtained petitioners' personal information to discern the extent of the alleged misconduct or identify particular defendants, those FOIA requests appear permissible under (b)(4) as "investigation in anticipation of litigation." Solicitation of new business, however, is not "investigation" within the meaning of (b)(4). And acquiring petitioners' personal information for a legitimate investigatory purpose does not entitle respondents to then use that same information to send direct solicitations. Each distinct disclosure or use of personal information acquired from a state DMV must be permitted by the DPPA. See §2724(a) ("A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains"); see also §2721(c). If the statute were to operate otherwise, obtaining personal information for one permissible use would entitle attor-

neys to use that same information at a later date for any
other purpose. For example, a lawyer could obtain per-
sonal information to locate witnesses for a lawsuit and
then use those same names and addresses later to send
direct marketing letters about a book he wrote.

B

The Court of Appeals held that the letters here were
solicitations, finding that "a reasonable recipient would
almost certainly have understood the message to be a
solicitation from a lawyer." *Id.*, at 293. The court noted
as relevant that respondents themselves took steps to
follow South Carolina bar rules governing attorney solici-
tations and rejected respondents' description of the letters
as investigatory in nature, given that "[n]o mention was
made of an investigation into certain practices other than
the implicit suggestion of investigation during a 'free
consultation.'" *Ibid.* The included reply card did not alter
the Court of Appeals' finding that the communications
were solicitations rather than investigation. Only those
interested in joining the lawsuit were directed to fill out
the card and the only place to sign the card was under the
phrase "I am interested in participating." See Appendix,
*infra*, at 31. The card asked for data regarding vehicle
purchases relevant to initiate the representation of the
prospective clients.

But although the Court of Appeals found that the letters
were solicitations, it held the communications nonetheless
exempt under (b)(4) because they were "inextricably inter-
twined" with permissible litigation purposes. 675 F. 3d, at
284. As explained above, however, if the use of DPPA-
protected personal information has the predominant
purpose of solicitation, that use is not protected by (b)(4).
A remand is necessary for application of the proper stand-
ard because the Court of Appeals could conclude, in light
of the content of the communications, taken with other

evidence in the record, that respondents' letters had the predominant purpose to solicit clients.

On remand, the Court of Appeals should determine whether the record shows that the communications sought, or were used, to develop the factual basis of the *Herron* complaint, locate witnesses, identify additional defendants, or perform any other investigative function related to the litigation. Even if so, the question is whether solicitation was the predominant purpose for sending the letters.

## V

This case does not involve the statutory section imposing criminal liability, which is written in different terms than the civil remedies provision. See §2723(a) ("A person who knowingly violates this chapter shall be fined under this title"). As to civil liability, the amount of damages sought in the complaint is based on the number of persons, over 30,000 individuals, whose personal and highly sensitive information was disclosed and who were solicited. Whether the civil damages provision in §2724, after a careful and proper interpretation, would permit an award in this amount, and if so whether principles of due process and other doctrines that protect against excessive awards would come into play, is not an issue argued or presented in this case.

In this framework, there is no work for the rule of lenity to do. This Court has held that "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber* v. *Thomas*, 560 U. S. ___, ___ (2010) (slip op., at 13) (citation and internal quotation marks omitted). But here, as discussed, the surrounding text and structure of the DPPA resolve any ambiguity in phrases "in connection with" and "investiga-

tion in anticipation of litigation" in (b)(4). Only where "the language or history of [the statute] is uncertain" after looking to "the particular statutory language, . . . the design of the statute as a whole and to its object and policy," does the rule of lenity serve to give further guidance. *Crandon* v. *United States*, 494 U. S. 152, 158 (1990). "The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." See *Callanan* v. *United States*, 364 U. S. 587, 596 (1961). There is no room for the rule of lenity where the text and structure of the DPPA require an interpretation of (b)(4) that does not reach out to include an attorney's solicitation of clients.

## VI

Solicitation of prospective clients is not a permissible use "in connection with" litigation or "investigation in anticipation of litigation" under (b)(4) of the DPPA. As a result, the Court of Appeals erred in granting respondents summary judgment without first determining whether the communications had the predominant purpose of solicitation. And since the solicited persons did not give express consent to the disclosure or use of their personal information for this purpose, the (b)(12) exception does not apply.

On remand, the Court of Appeals, or the District Court, must determine whether respondents' letters, viewed objectively, had the predominant purpose of solicitation. The Court of Appeals' finding that these letters were solicitations can be the basis for the further conclusion that solicitation was the predominant purpose of their transmission. Because the Court of Appeals applied the wrong standard in finding these solicitations exempt under (b)(4), however, the Court remands for application of the proper standard.

Further proceedings also may be required to determine whether the initial act of obtaining petitioners' personal information was permitted under the DPPA. The Court of Appeals and the District Court seem to have agreed that the first two FOIA requests were made in order for respondents to decide whether to file the MDDA lawsuit as a group action and to identify the highest volume dealers. App. 39a. If, in light of this opinion, the courts on remand adhere to the determination that the first two FOIA requests were exempt under (b)(4), the later uses and disclosures of that information, nevertheless, may be independent violations of the DPPA.

If the use of petitioners' personal information to send the letters in this case is deemed to be a violation of the Act, then the courts can decide if it remains relevant and necessary, for liability and damages purposes, to determine whether the last four FOIA requests were also in violation of the DPPA. Assuming violations of the DPPA are established, questions regarding the calculation and assessment of damages then can be considered.

Neither this Court nor the Court of Appeals has considered whether respondents' conduct was permissible under the (b)(1) governmental-function exception. Whether solicitation would be permitted conduct under (b)(1) is not resolved by this case. This case turns on the interpretation of "in connection with" litigation and "investigation in anticipation of litigation," phrases not included in (b)(1). Where personal information is used for the predominant purpose of solicitation, the fact that the solicitation itself may serve a governmental function is not relevant to the interpretation of (b)(4). It may, however, be relevant to the (b)(1) inquiry. Respondents' argument that they were authorized under state law to act as private attorneys general on behalf of the State is properly addressed under (b)(1). Arguments related to (b)(1) and other defenses, to the extent they have been preserved and are still proper to

consider, must be for further proceedings on remand.

This Court now holds that sending communications for the predominant purpose of solicitation is not a use of personal information exempt from DPPA liability under (b)(4).

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Appendix to opinion of the Court

## APPENDIX

From the Law Firms of

| Michael E. Spears, PA | Gedney M. Howe, III, PA | Richard A. Harpootlian, PA | Lewis & Babcock, L.L.P. |
|---|---|---|---|
| Michael E. Spears | Gedney M. Howe, III | Richard A. Harpootlian | A. Camden Lewis |
| Post Office 5806 | Post Office Box 1034 | P.O. Box 1090 | Post Office Box 11208 |
| Spartanburg, SC 29304 | Charleston, SC 29402 | Columbia, SC 29202 | Columbia, SC 29211 |
| (864) 583-3535 | (843)722-8048 | (803)252-4848 | (803)771-8000 |
| (888) 583-3588. | | (866) 706-3997 | |

ADVERTISING MATERIAL

May 8, 2007

Dear Sir/Madam:

We represent a group of consumers in a pending lawsuit arising from South Carolina car dealerships charging an add-on, often referred to as an "administrative fee," a "recording and processing fee," "closing fee," or "dealer documentation and closing fee". We believe that these fees are being charged in violation of South Carolina law.

We understand that you may have been charged one of these fees on your recent purchase of an automobile. We obtained this information in response to a Freedom of Information Act request to the South Carolina Department of Motor Vehicles.

The exact nature of your legal situation will depend on facts not known to us at this time. You should understand that the advice and information in this communication is general and that your own situation may vary. However, we would like the opportunity discuss your rights and options with you in a free consultation. If you are interested in participating in the case or in a free consultation, please mail the enclosed postage paid card and we will contact you soon.

You may wish to consult your lawyer or another lawyer instead of us. You may obtain information about other lawyers by consulting the Yellow Pages or by calling the South Carolina Bar Lawyer Referral Service at 799-7100 in Columbia or toll free at 1-800-868-2284. If you have already engaged a lawyer in connection with the legal matter referred to in this communication, you should direct any questions you have to that lawyer.

Sincerely,

Richard A. Harpootlian

ANY COMPLAINTS ABOUT THIS LETTER OR THE REPRESENTATIONS OF ANY LAWYER MAY BE DIRECTED TO COMMISSION ON LAWYER CONDUCT, POST OFFICE BOX 11330, COLUMBIA, SOUTH CAROLINA, 29211 – TELEPHONE NUMBER 803-734-2038.

Appendix to opinion of the Court

PLEASE COMPLETE THE FOLLOWING:

NAME: _____ DATE: _____

ADDRESS: _____

_____

TELEPHONE #: _____

DEALERSHIP: _____

TYPE OF CAR: _____

ADMINISTRATIVE FEE                    DATE OF
OR PROCESSING FEE: $_____ PURCHASE: _____
(Amount as shown on invoice)

I am interested in participating.
SIGNATURE: _____



LEWIS & BABCOCK, L.L.P.
Attention: A. Camden Lewis, Esquire
1513 Hampton Street
Columbia, South Carolina 29201

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–25

_____

EDWARD F. MARACICH, ET AL., PETITIONERS *v.*
MICHAEL EUGENE SPEARS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 17, 2013]

JUSTICE GINSBURG, with whom JUSTICE SCALIA, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Respondents are lawyers who served as counsel in a representative action against South Carolina car dealers alleged to have charged car buyers unlawful administrative fees. In connection with that litigation, the lawyers obtained from South Carolina's Department of Motor Vehicles (DMV) information identifying buyers who may have been charged unlawful fees and dealers who may have conspired to exact those fees. The lawyers subsequently sent letters to the identified buyers inquiring whether they had been charged administrative fees, informing them of the litigation, and inviting them to join as plaintiffs. The courts below determined that the lawyers' requests for the information and their use of it fell squarely within the litigation exception to the Driver's Privacy Protection Act of 1994 (DPPA), 18 U. S. C. §2721(b)(4), and that the Act's limitation on solicitation, §2721(b)(12), did not override the litigation exception. I would affirm that sound judgment. As the Fourth Circuit explained, respondents "did what any good lawyer would have done." 675 F. 3d 281, 298 (2012). This Court's holding, exposing respondents not only to astronomical liquidated damages, §2724(b)(1), but to criminal fines as well, §2723(a), is scarcely what Congress ordered in enacting the DPPA.

Respondent-lawyers obtained and used DMV information for "investigation in anticipation of litigation" and for communications "in connection with" a civil action. I would read that statutory language to permit use of DMV information tied to a specific, concrete proceeding, imminent or ongoing, with identified parties on both sides of the controversy. So read, §2721(b)(4) permitted the lawyers' conduct. Neither §2721(b)(12) nor any other provision of the DPPA warrants the massive liability this Court's judgment authorizes.

I

Public concern regarding the ability of criminals and stalkers to obtain information about potential victims prompted Congress, in 1994, to enact the DPPA. A particular spur to action was the 1989 murder of the television actress Rebecca Schaeffer by a fan who had obtained her address from the California DMV. *Taylor* v. *Acxiom Corp.*, 612 F. 3d 325, 336 (CA5 2010); Electronic Privacy Information Center, The Drivers Privacy Protection Act (DPPA) and the Privacy of Your State Motor Vehicle Record, http://www.epic.org/privacy/drivers/ (as visited June 14, 2013, and available in Clerk of Court's case file). See also 139 Cong. Rec. 29470 (1993) (remarks of Sen. Biden). Congress sought to close what it saw as a loophole caused by state laws allowing requesters to gain access to personal information without a legitimate purpose. Addressing that problem, Congress established a "regulatory scheme that restricts the States' ability to disclose a driver's personal information without the driver's consent." *Ante*, at 7 (internal quotation marks omitted).

The DPPA generally prohibits any state DMV from "knowingly disclos[ing] or otherwise mak[ing] available to any person" personal information about any individual. 18 U. S. C. §2721(a). This prohibition is subject to a number of statutory exceptions, including stated purposes for

which the DPPA requires disclosure and 14 purposes for which the DPPA permits disclosure. §2721(b). The 14 permitted uses of DMV data are designed to "strik[e] a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information." 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran). State DMVs may release information for any one of these permitted purposes, but they are not required to do so.

This case arises from a state-court lawsuit—the *Herron* litigation—to enforce the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act (MDDA), S. C. Code Ann. §56–15–10 *et seq.* (2006 and Supp. 2011). Respondent-lawyers were approached by a number of recent car purchasers who complained that they had been charged unlawful fees. On behalf of the car purchasers, the lawyers filed a complaint alleging that the car dealerships had violated state law. The initial complaint identified four purchasers as named plaintiffs and 51 dealers as defendants; the pleading was soon amended to name eight plaintiffs and, as defendants, 324 dealers. 675 F. 3d, at 285. The complaint invoked the MDDA's representative action provision, which allows an individual to act as a private attorney general bringing suit "for the benefit of the whole." S. C. Code Ann. §56–15–110(2). Ultimately, the *Herron* litigation yielded a declaratory judgment that the dealers had indeed violated state law. Subsequent settlements gained monetary relief for over 30,000 overcharged car purchasers. The state court found that the *Herron* plaintiffs, "as private attorneys general, [had] represented the public interest in attempting to regulate allegedly unfair practices by motor vehicle dealers and therefore represent all those affected by such practices." App. 253–254.

Respondent-lawyers obtained and used information from the state DMV both shortly before filing suit and

during the pendency of the state-court litigation. Before
filing suit, they asked the DMV for information about
recent car purchases in six South Carolina counties.
These requests explained that respondent-lawyers repre-
sented a group of "plaintiffs who have complained of cer-
tain conduct as a result of their transactions with car
dealers," and that the lawyers were "attempting to deter-
mine if this [conduct was] a common practice." 675 F. 3d,
at 284 (internal quotation marks omitted).

After the lawsuit was filed, respondent-lawyers obtained
the names of persons who had purchased cars from the
dealers they had identified as defendants and mailed
letters to those purchasers. *Ante*, at 4. These dispatches
are the actions that, in the Court's view, render respondent-
lawyers potentially liable for violating the DPPA. To
determine whether the DPPA authorized the respondent-
lawyers' uses of DMV information, I first consider the
posture of the *Herron* litigation at the time of the mailings
to car purchasers. The complaint filed by respondent-
lawyers on behalf of the car purchasers alleged that the
dealers were involved in a conspiracy to charge unlawful
fees. App. 138–139. In a competitive market, the lawyers
urged, such conduct can succeed only when done in concert
with other dealers; otherwise, consumers would take their
business elsewhere. Meanwhile, the dealers moved to
dismiss the conspiracy claim and argued there was no
party with standing to sue those dealers who had not sold
a car to a named plaintiff. *Id.*, at 155.

The state court denied the dealers' motion to dismiss,
stating that the complaint alleged sufficient facts "sup-
porting standing of the plaintiffs to proceed" against all
defendants, and that there were "sufficient allegations of
civil conspiracy" to avoid threshold dismissal of that claim.
*Id.*, at 212. At a subsequent hearing, the state court clari-
fied that respondent-lawyers could "go forward with eight
people [the named plaintiffs]" and the court would consider

the standing issue raised in the dealers' motion to dismiss "when all the discovery is in and it comes to dispositive motions." Record in No. 7:09–cv–1651–HMH (D SC), Doc. 78–9, p. 50.[1] The state court's initial ruling, in other words, was that the complaint filed by respondent-lawyers was sufficient under state law to mount a concrete dispute between their clients and *all* the overcharging dealers, and to enable the lawyers to proceed to discovery. But in view of the *Herron* defendants' insistence that a dealer could not be sued absent a named plaintiff who purchased from that dealer,[2] respondent-lawyers understandably sought to identify, and add to the roster of plaintiffs, a purchaser from each named defendant. In that endeavor, as the Fourth Circuit recognized, they "did what any good lawyer would have done." 675 F. 3d, at 298.

This context illuminates how the letters at issue in this case—which were mailed after the complaint was filed and while the dealers' motion to dismiss was pending—served to advance the representative character of the suit during a critical time in the *Herron* litigation. The letters included a card asking recipients to respond by stating the type of car they had purchased, the name of the dealer and date of purchase, whether they had been charged the allegedly unlawful fee and, if so, the amount of the fee, and whether they were interested in participating in the lawsuit. See, *e.g.*, App. 93, 106. These questions served an investigative purpose: to gather information about the fees charged by

————————

[1] The Court is thus incorrect to suggest that, early on in the state court litigation, plaintiffs' standing to sue all dealers was definitively settled. See *ante*, at 21. In fact, the state court left room for the dealer-defendants to renew their standing objection on completion of discovery.

[2] The *dealers* thus were urging that additional plaintiffs were "necessary" to the maintenance of the dealer-conspiracy charge. Cf. *ante,* at 13 ((b)(4) permits contacting persons "who are necessary parties").

dealers with whom the *Herron* plaintiffs claimed to have a concrete dispute.[3]  They also served to identify additional persons who might wish to be named as plaintiffs in the group action, persons whose joinder would defeat or diminish the dealers' insistence that plaintiffs could sue only dealers from whom they personally purchased cars.  See 675 F. 3d, at 285–286; *ante*, at 5 (faced with that insistence, respondent-lawyers eventually dropped "all claims against dealerships without a corresponding plaintiff-purchaser").

## II

The DPPA permits disclosure of personal information:

"For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court."  18 U. S. C.

--------

[3] The *Herron* litigation targeted a conspiracy to overcharge.  Inquiries geared to discovering the victims of the conspiracy cannot plausibly be written off as entirely noninvestigative in character.  The Fourth Circuit so comprehended: "[T]he [l]awyers were looking to build and bolster a case against the dealerships if their initial information from consumers proved the existence of plausibly systemic violations of the Dealers Act."  675 F. 3d 281, 299 (2012).  The Court asserts that the Court of Appeals "rejected respondents' description of the letters as investigatory in nature."  *Ante*, at 25.  That tells half the story.  True, the Fourth Circuit disagreed with the District Court's determination that "the [l]awyers were not engaged in [any] solicitation."  675 F. 3d, at 293.  But the appeals court twice clarified that, in developing the suit against the car dealers, the respondent-lawyers engaged in both investigation and solicitation; indeed, the Fourth Circuit described the two as "inextricably intertwined."  *Id.,* at 294, 300.  No place did the Court of Appeals find that the communications were solicitations only, not at all "investigative."  In asserting otherwise, *ante*, at 25, the Court indulges in wishful thinking.

§2721(b)(4).

Respondent-lawyers' use of the DMV-supplied information falls within the plain language of this provision. The Court's attempt to read a solicitation-specific limitation into this provision has no mooring in §2721(b)(4)'s text and misperceives the structure of the DPPA.

A

Congress used expansive language in framing the §2721(b)(4) exception, starting with the words "in connection with" and thrice repeating the word "any." See *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 383 (1992) ("The ordinary meaning of th[e] words ['relating to'] is a broad one."); *Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 563 U. S. 1, \_\_\_ (2011) (slip op., at 7) ("[T]he phrase '*any* complaint' suggests a broad interpretation."). Notably, the Court acknowledges that (b)(4) is "susceptible to a broad interpretation," and, "in literal terms," could be read "to include the personal information that [respondent-lawyers] obtained here." *Ante,* at 9.

This case should therefore be easy. One need not strain to see the connection between the respondent-lawyers' conduct and a specific civil proceeding. No attenuated chain of connection need be established. All the uses of DMV information at issue took place when a concrete civil action between identified parties was either imminent or pending. Thus, the uses were indisputably "in connection with" a civil proceeding.

The Court apparently recognizes that the initial requests for DMV information—to investigate the vitality of the claims before filing suit—were in connection with the litigation. See *ante,* at 27–28. But if anything, the later requests and the letters mailed to car purchasers were even more closely tied to the case. The letters were sent *after* litigation commenced, when the respondent-lawyers, on behalf of their clients, were pursuing conspiracy claims

against each of the defendant car dealers.  Of equal importance, because the suit qualified under state law as a representative action, respondent-lawyers represented and were obligated to serve the interests of all car purchasers affected by the charged illegal conduct.  Respondent-lawyers' uses of DMV information in aid of the *Herron* litigation facilitated the discharge of their professional obligations to the court, their individual clients, and the "whole" group of named and unnamed purchasers that state law required the lawyers to serve.  S. C. Code Ann. §56–15–110(2).

It would be extraordinary for Congress to pass a law disturbing the processes of a state court in such a case. "[T]he National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States," and this includes a general "deference to the state adjudicative process." *Levin* v. *Commerce Energy, Inc.*, 560 U. S. 413, ___ (2010) (slip op., at 15–16) (quoting *Younger* v. *Harris*, 401 U. S. 37, 44 (1971)).  We have taken special care to emphasize "the State's strong interest in regulating members of the Bar," *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 467 (1978), and have cautioned against undue "Federal interference with a State's traditional regulation of [the legal] profession," *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 362 (1977).  One would therefore expect Congress to speak clearly if it intended to trench on state control in this domain.

I find no such clear statement in the DPPA.  Quite the contrary, the DPPA instructs that "use [of DMV information] in connection with any civil . . . proceeding in any . . . State . . . court" is permissible under federal law. §2721(b)(4).

B

Rather than adopt a straightforward interpretation of

the statute, the Court labors to justify reading a limitation
into (b)(4) that has no basis in the text of that provision.
Solicitation, the Court says, is not permissible under (b)(4)
even if it targets a specific civil proceeding. The Court
offers two primary arguments for this conclusion. First,
the Court contends, a bar on solicitation must be read into
(b)(4) lest that provision permit all uses "with a remote
relation to litigation." *Ante,* at 9. Second, the Court as-
serts, its interpretation is necessary to respect the "struc-
ture and purpose of the DPPA" and the "objective" of
subsection (b)(12). *Ante,* at 9, 17. Neither argument is
persuasive.

I agree with the Court that the words "in connection
with" must be contained within reasonable bounds. But
the Court immediately jumps from this premise to the
conclusion that "an attorney's solicitation of prospective
clients falls outside of [any reasonable] limit." *Ante,* at
10–11; *ante,* at 11, 13 (solicitation, a "discrete act" prohib-
ited by the statute, allows no exception for conduct "in
connection with litigation"). The leap is startling. In prior
decisions, when the Court has sought a limiting principle
for similar statutory language, it has done so to prevent
the application of a statute to matters with "only a tenu-
ous, remote, or peripheral connection" to the statute's core
purpose. *New York State Conference of Blue Cross & Blue
Shield Plans* v. *Travelers Ins. Co.,* 514 U. S. 645, 661
(1995) (quoting *District of Columbia* v. *Greater Washing-
ton Bd. of Trade,* 506 U. S. 125, 130, n. 1 (1992)). The
focus, in other words, has been on the degree of connection
between the concerns central to the law and the disputed
application of the measure.

The majority's focus on solicitation, however, tells us
almost nothing about the degree of connection between the
use of DMV information and a civil proceeding. It matters
not to the Court whether a solicitation is of vital im-
portance to an ongoing proceeding or far removed from

any proceeding which may or may not be brought. A rule barring any communication for which solicitation is a predominant purpose bears no logical relationship to the §2721(b)(4) phrase "in connection with." And the majority's concentration on solicitation is uninformative on the degree of connection to a civil proceeding needed for uses of DMV information that do not involve solicitation.

The majority's sojourn away from §2721(b)(4)'s text in search of a limiting principle is unwarranted. A limit to the scope of (b)(4) can be readily identified by attending to the phrasing of the provision and its focus on a "proceeding." Congress used similar language in the obstruction of justice statute, which criminalizes various attempts to interfere with a "proceeding." 18 U. S. C. §1512. The Court had no difficulty identifying a limiting principle in this term; it held that the statute applies only to persons who "have in contemplation any particular official proceeding." *Arthur Andersen LLP* v. *United States*, 544 U. S. 696, 708 (2005). By the same token, (b)(4) is best interpreted to permit only uses tied to a concrete, particular proceeding.

Congress' use of the phrase "in anticipation of litigation" provides further support for this interpretation. The phrase is hardly unique to (b)(4); it is commonly used to refer to the time at which the work-product privilege attaches to an attorney's work for a client and the time at which a party has a duty to preserve material evidence. See, *e.g.,* Fed. Rule Civ. Proc. 26(b)(3) ("documents and other tangible things that are prepared in anticipation of litigation" are not discoverable); *Silvestri* v. *General Motors Corp.*, 271 F. 3d 583, 592 (CA4 2001) (plaintiff had "failed to preserve material evidence in anticipation of litigation"). Both now and when the DPPA was enacted, courts have understood this phrase to require a concrete dispute between parties, and to exclude the abstract possibility of a hypothetical lawsuit. See, *e.g., National Union*

*Fire Ins. Co.* v. *Murray Sheet Metal Co.*, 967 F. 2d 980, 984 (CA4 1992) (the "general possibility of litigation" is not enough; a document is prepared in anticipation of litigation when there is "an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation"); *Gould Inc.* v. *Mitsui Mining & Smelting Co.*, 825 F. 2d 676, 680 (CA2 1987) (application of Rule 26(b)(3) "depends upon the existence of a real, rather than speculative, concern").

Usage of the same words in other prescriptions indicates that (b)(4) is indeed limited by its text. A hypothetical case without identified adverse parties is not encompassed by (b)(4). To anticipate a particular civil proceeding, a lawyer must have a client whose claim presents a genuine controversy.[4] Trolling for prospective clients with no actual or imminent proceeding, involving already identified adverse parties, in sight—apparently, the Court's primary concern—would not be a permissible use.[5] Affirming the judgment below, the Court fears, would permit lawyers to bring placeholder lawsuits on behalf of "friend[s] or family member[s]," then use DMV data to solicit plaintiffs for "a lawsuit that would otherwise be dismissed for lack of standing." *Ante*, at 20–21. This is a canard. No court would hold such a case a genuine con-

---

[4] Respondent-lawyers propose a broader reading of (b)(4), arguing that any use tied to an identified "transaction, occurrence, [or] defect" should be permissible. Tr. of Oral Arg. 58. Their reading, however, fails to account for all the words in (b)(4), most notably the provision's focus on a "proceeding." See *Arthur Andersen LLP* v. *United States*, 544 U. S. 696, 707–708, and n. 10 (2005) (destroying evidence of suspicious transactions could not give rise to liability under 18 U. S. C. §1512 unless done in contemplation of a particular proceeding).

[5] Furthermore, a use consistent with federal law may nevertheless be impermissible. The State makes the ultimate choice whether to release DMV information for any purpose under (b)(4). See Tr. of Oral Arg. 42. States are well suited to policing attorney conduct, a sphere of traditional state authority.

troversy. The Court's hypothetical bears not even a remote resemblance to the facts of this case. The state court here *denied* the defendants' motion to dismiss the conspiracy claim on standing grounds. *Supra,* at 4–5. See also *ante*, at 5 (describing the state court's ruling that the named plaintiffs had standing to sue the "dealerships from which they had purchased automobiles *and any alleged coconspirators*" (emphasis added)).

This case is squarely within the metes and bounds of (b)(4). The letters advanced the concrete interests of the respondent-lawyers' clients within a pending adversarial civil proceeding in state court. Just as the letters at issue in this case would be in contemplation of a particular "proceeding" as that term is used in 18 U. S. C. §1512, and would be "in anticipation of litigation" as Rule 26(b)(3) employs that term, they fall within the very same language as it appears in §2721(b)(4).

The Court's second argument is no more convincing. A severe limit must be read into (b)(4), the Court urges, to respect the structure of the statute. Specifically, the Court spotlights that another permissible use, (b)(12), allows "bulk distribution for surveys, marketing or solicitations," but only to individuals who have consented to allow use of their information for this purpose. Petitioners here devoted much of their briefing to arguing that (b)(12) is somehow more "specific" than (b)(4), see Brief for Petitioners 18–31; Reply Brief 3–12, but the Court rightly rejects that reasoning. *Ante,* at 16. Neither provision is more specific than the other; the two simply cover different subjects.

Without the specific-governs-the-general canon, the case for using (b)(12) to interpret (b)(4) evaporates. The Court suggests there would be "tension" between the two provisions if a use of DMV information were permitted by (b)(4) but not permitted by (b)(12). *Ante,* at 21. Every permissible use of DMV information, however, is permitted by

some—often just one—of the 14 enumerated exceptions and not permitted by others. The DPPA surely does not convey that every time a person obtains DMV information in accord with one exception, that exception comes into conflict with other exceptions under which the information could not be obtained. Indeed, it is the Court's opinion that creates tension, by taking a use that would be permissible under (b)(4)—and therefore permissible under the DPPA—and importing into it a restriction delineated in an entirely different exception.

If applied generally to §2721(b), the Court's approach would frustrate the evident congressional purpose to provide a set of separate exceptions, any one of which makes permissible the uses therein. Consider a consulting company hired by a State to conduct research into motor vehicle safety. Depending on the particulars of the research project, the company might seek to obtain DMV information under the uses listed in (b)(1), (2), (5), (12), or (14).[6] These exceptions entail different requirements, so the project might well fit within one or two of them but not the others. It would be ludicrous to treat the fact that the project did not fit within one exception as establishing that the project should not be allowed under any other exception. Construing the DPPA in that manner would render the statute totally unworkable. The majority does not take that outlandish position with respect to all the exceptions. *Ante*, at 16. Instead, without any congressional instruction to do so, the Court reads (b)(12)—the 12th on a list of 14 permissible uses—as so central a part

_____

[6] The exception in (b)(1) covers uses by a State or entity acting on behalf of a State; (b)(2) covers uses for matters of motor vehicle or driver safety; (b)(5) covers uses in research activities; (b)(12) covers uses for surveys; and (b)(14) covers uses related to the operation of a motor vehicle or public safety, if authorized by state law. The degree of overlap among these provisions undermines the Court's suggestion that the list should be read to avoid surplusage. *Ante,* at 20.

of the DPPA that it alone narrows the scope of other
exceptions.

## III

Under the most sensible reading of §2721(b)(4), see
*supra,* at 6–7, the uses of DMV information at issue here
would be permissible. The dispositive question should be:
Is the use tied to a concrete civil action between identified
parties that is ongoing or impending? Even if the statute
could be viewed as ambiguous, there is ample reason to
adopt that straightforward reading. The alternative
reading embraced by the Court generates uncertainty
regarding the scope of other uses enumerated in §2721(b);
creates difficult line-drawing problems; and imposes crim-
inal and draconian civil liability, at odds with the principle
of lenity.

First, the Court's reading clouds other uses the DPPA
permits. According to the Court, the exceptions in
§2721(b) should be construed so as not to "interfere" with
(b)(12), which "implements an important objective of the
DPPA." *Ante*, at 17–18.[7] Therefore, (b)(12) is "relevan[t]"
in interpreting those "exceptions whose breadth and appli-
cation are uncertain." *Ante*, at 18. Little light is cast on
which enumerated exceptions fit that description. Subsec-
tion (b)(4) fits, the Court asserts, but (b)(1) apparently

---

[7] The placement of (b)(12) toward the end of a list of 14 hardly signals
its special importance. The Court cites *Reno* v. *Condon*, 528 U. S. 141,
143, 148 (2000), but the cited passages do not so much as suggest that
(b)(12) is more central to the congressional purpose than other excep-
tions. From the text and history of the DPPA, it would be fair to say
that the driving purpose of the Act was to prevent access to information
by criminals and stalkers, while allowing access for legitimate govern-
mental and business purposes. See *supra,* at 2–3. Giving primacy to
(b)(12) is all the more questionable, for that exception was included not
to proscribe, but to *allow*, some direct marketing. See Brief for Re-
spondents 29. Absent the provision, the DPPA would permit no such
use.

does not. See *ibid.* But what makes (b)(1) clear, while (b)(4) is uncertain? The Court provides no answer, not even a clue. Lower courts will be left to puzzle over when (b)(12) comes to the fore, rendering impermissible uses that otherwise fit within another exception.

The Court sows further confusion by narrowly construing the four exceptions that permit disclosure of information the DPPA ranks as "highly restricted personal information." §2721(a)(2); see *ante*, at 14. These exceptions apply to uses by the government, (b)(1); court operations, (b)(4); use by insurance companies, entities pervasively regulated by the States, (b)(6); and commercial driver's licenses, which are regulated by the Federal Government and administered by the States, (b)(9).[8]

A common thread unites the four categories: All involve the functioning or oversight of state governments on matters important to the State and persons within the State's governance. For uses of this genre, the need for the information can be especially high, and the likelihood of misuse, especially low. Congress therefore took care to authorize broad access to DMV information for uses these exceptions allow. I would read §2721(b) as according the States ample leeway to use and authorize use of their own DMV information in these areas of traditional state authority.

Second, the Court's holding is hard to grasp and will be difficult to apply. The Court first suggests that "[t]he proper solution is to draw the line at solicitation itself," to "exclud[e] [solicitation] from the activity permitted in (b)(4)." *Ante*, at 21. Backing away from this clear, if erroneous, solution, the Court settles on an inquiry into "whether obtaining, using, or disclosing the personal information . . . had the predominant purpose to solicit." *Ante*, at 22. The Court's cryptic discussion of its "predom-

—————
[8] See 49 U. S. C. §31308.

inant purpose" test inspires little confidence. See *ibid.*
(the purpose "might be evident from the communication
itself," but "[c]lose cases may arise"). In truth, however,
the line between a lawyer's function as an officer of the
court and her notice to, and solicitation of, new clients
may be indistinct. See *infra*, at 17, n. 10.

Consider an attorney whose client has been the victim of
a hit-and-run. The victim recalls the license plate of
another car at the scene, which was also hit by the offend-
ing driver. In order to investigate her client's case, and to
ensure that "there is a supportable theory for a com-
plaint," *ante,* at 14, a responsible attorney would contact
this second victim, who may be able to provide useful
information about the incident. But the second victim is
also a potential plaintiff in her own right. A communica-
tion might therefore be viewed by the state bar as falling
within the rules for solicitation. See S. C. Rule of Profes-
sional Conduct 7.3(d) (2012) (solicitation rule applies to
communications between an attorney and "a prospective
client known to be in need of legal services in a particular
matter").[9] Under today's decision, the attorney will be in
an impossible position. Her duties to her client—and to
the court to conduct a reasonable investigation before
filing a lawsuit—instruct her to contact the potential
witness. To avoid running afoul of the state bar's rules,
however, she may need to label any communication with
the witness as a solicitation. But if she does that, today's
ruling would expose her to liability under the DPPA.

This example is not so far removed from the facts of this
case. Petitioners conceded, both in their briefs and at oral
argument, that the DPPA would have permitted respond-
ents to contact the purchasers of cars to ask them whether

―――――――

[9] Beyond debate, the solicitation here was permissible under South
Carolina's ethics rules. Petitioners do not argue otherwise. The Court
considers this a "relevant," but not "dispositive" factor. *Ibid.*

they paid the unlawful fees. Brief for Petitioner 48; Tr. of Oral Arg. 14–15. Indeed, such an investigation was critical to pursuit and resolution of the *Herron* litigation. See *supra,* at 5. But in this case, as in the hypothetical case just posed, investigating the facts involved contacting people who might potentially become parties. And professional rules regarding solicitation may well apply to such communications.

Reality thus belies the Court's pretense that a bright line separates solicitation from other aspects of a lawyer's role as officer of the court. Perhaps aware that, in many cases, the line will be hazy or hard to find, the Court resorts to inapposite comparisons. The Court notes, for example, that it would be impermissible for a lawyer to use information obtained from the DMV to send out advertisements for "a book he wrote." *Ante*, at 24. But no one would confuse bookselling with investigation in anticipation of litigation; such a use would be impermissible under any reading of (b)(4).

The Court's disposition will require lower courts to parse whether every communication using DMV information in the course of litigation has solicitation as a "predominant purpose." *Ante*, at 22. The holding in Maracich's case, I fear, will, at a minimum, impede the efficient administration of state-court litigation and may well prove infeasible.[10] Cf. *United States* v. *Jicarilla Apache Nation*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 18) (rejecting

_____

[10] Suppose the state court had ordered respondents, as a condition of retaining certain defendant-dealers in the suit, to bring in purchasers from those dealers. Cf. *supra,* at 4–5. Under today's decision, the lawyers' compliance with the court's order would place them at risk of liability under the DPPA. See *ante,* at 23 (recognizing that (b)(4) would permit an attorney to send class notice "pursuant to a court order," but expressing uncertainty whether even a court order would permit the mailings here at issue). Congress could hardly have intended to create such a conflict.

as unworkable a "case-by-case inquiry into the purpose of each communication" involving government attorneys in the administration of tribal trusts).

This case illustrates the problem. In truth, the letters served both as an investigative tool and as an invitation to car purchasers to join the *Herron* suit. How is the fact-finder to determine which purpose was predominant? Toss a coin when the trier finds the answer is: "six of one, half dozen of the other"? As the Court of Appeals recognized, the use here, although qualifying as a solicitation, "was inextricably intertwined with investigation and prosecution of the *Herron* litigation." 675 F. 3d, at 300.

Finally, the rule of lenity requires that we resolve any residual ambiguity in respondents' favor. Petitioners sought $2,500 in statutory damages for every letter mailed—a total of some $200 million—and punitive damages to boot. Brief for Respondents 15. Such damages cannot possibly represent a legislative judgment regarding average actual damage. The Court's opinion is wrong to suggest that the rule of lenity does not apply to governmental penalties so long as they are payable to private individuals and labeled "liquidated damages," rather than "criminal fines." Moreover, the DPPA, which appears in Title 18 of the United States Code, imposes criminal liability for a knowing violation of its provisions. 18 U. S. C. §2723(a). Because this is a civil case, I need not consider what defenses respondent-lawyers might have were they criminally prosecuted. But because we are interpreting a criminal statute, "it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage," even in a civil case. *Crandon* v. *United States*, 494 U. S. 152, 158 (1990). See also *Leocal* v. *Ashcroft*, 543 U. S. 1, 12, n. 8 (2004) (explaining that, if a statute has criminal applications, "the rule of lenity applies" to the Court's interpretation of the statute "[b]ecause we must interpret the statute consistently,

whether we encounter its application in a criminal or noncriminal context"); *Scheidler* v. *National Organization for Women, Inc.*, 537 U. S. 393, 408–409 (2003) (applying rule of lenity in civil case asserting claims under Hobbs Act); *United States* v. *Thompson/Center Arms Co.*, 504 U. S. 505, 518 (1992) (plurality opinion) (applying rule of lenity in tax case); *id.,* at 519 (SCALIA, J., joined by THOMAS, J., concurring in judgment) (agreeing with plurality's application of rule of lenity); *Acxiom Corp.*, 612 F. 3d, at 332, n. 5 (recognizing DPPA should be construed in light of rule of lenity).

The Court recognizes that there may be ambiguity in the (b)(4) phrases "in connection with" and "investigation in anticipation of litigation." *Ante*, at 26. But it finds any ambiguity in these phrases resolved by the structure of the DPPA. *Ibid.* What "structure," one may ask, other than an enumeration of 14 discrete exceptions, each permitting disclosure? See *supra,* at 11–12. The DPPA has been in effect for over 15 years, and yet the Court points to no judicial decision interpreting the statute in the way it does today. We should hesitate to adopt a novel interpretation of a federal statute that subjects parties to crushing liability. "[I]t is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931) (opinion for the Court by Holmes, J.). Respondent-lawyers were given no such fair warning.

## IV

The Court today exposes lawyers whose conduct meets state ethical requirements to huge civil liability and potential criminal liability. It does so by adding to the DPPA's litigation exception a solicitation bar Congress did not place in that exception. Because respondent lawyers' use of DMV information fits within the exception deline-

ated in §2721(b)(4), I would affirm the Fourth Circuit's judgment.