# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Filed May 2, 2023

No. 21-5045

DAMIEN GUEDES, ET AL.,
APPELLANTS

FIREARMS POLICY COALITION, INC.,
APPELLEE

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02988)

———

On Petition for Rehearing En Banc

———

Before: SRINIVASAN, *Chief Judge*; HENDERSON***,
MILLETT**, PILLARD, WILKINS**, KATSAS*, RAO*,
WALKER****, CHILDS, and PAN*, *Circuit Judges*

**O R D E R**

Appellants' petition for rehearing en banc and the response thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
Daniel J. Reidy
Deputy Clerk

* Circuit Judges Katsas, Rao, and Pan did not participate in this matter.

** A statement by Circuit Judge Wilkins, joined by Circuit Judge Millett, concurring in the denial of rehearing en banc, is attached.

*** Circuit Judge Henderson would grant the petition for rehearing en banc. A statement by Circuit Judge Henderson, dissenting from the denial of rehearing en banc, is attached.

**** Circuit Judge Walker would grant the petition for rehearing en banc. A statement by Circuit Judge Walker, dissenting from the denial of rehearing en banc, is attached.

WILKINS, *Circuit Judge*, with whom MILLETT, *Circuit Judge*, joins, concurring in the denial of the petition for rehearing en banc: Petitioners raised two arguments as reasons of "exceptional importance" for granting the petition, *see* Fed. R. App. P. 35(a)(2), namely (1) whether the interpretation of the statutory terms defining a "machine gun" to include bump stocks by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or the "Bureau") is the best reading of the statute, and (2) whether the purported ambiguity in the statutory definition compels an interpretation in their favor pursuant to the rule of lenity. The panel opinion thoroughly addressed both arguments, *see Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306 (D.C. Cir. 2022), and neither merit further review by our court.

I write only to clarify a couple of matters and to respond to some of the points made in the rehearing petition and by my dissenting colleagues.

## I.

First, I must address some misconceptions about the legislative and regulatory history.

"Representing the first major federal attempt to regulate firearms, the [National Firearms Act of 1934] concentrated on particularly dangerous weapons and devices such as machine guns, sawedoff shotguns and silencers." *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002). *See* Pub. L. No. 73-474, 48 Stat. 1236 (1934). As originally conceived, the Act and its implementing regulations did not ban the possession of machine guns outright; instead, they required a person seeking to obtain a machine gun to file an application with the Treasury Department, pay a hefty transfer tax, and submit a photograph, fingerprints, and a certificate from a local law enforcement official attesting their belief that the person intended to use the firearm for lawful purposes. *Lomont*, 285 F.3d at 11–12. If the

Treasury Department granted the application, the person's name and address, along with the serial number of the machine gun, were placed in a registry. *Id.* The Act made the manufacture, transfer, or possession of a machine gun without Treasury approval and payment of applicable taxes unlawful. *See* 26 U.S.C. § 5861. In 1986, Congress prohibited the transfer or possession of machine guns, except by authorized military or governmental officials, unless the person lawfully possessed the machine gun prior to May 19, 1986. *See* Act of May 19, 1986, Pub. L. No. 99-308, § 102, 100 Stat. 449 (1986); *see also* 18 U.S.C. § 922(o).

As drafted in 1934, the National Firearms Act defined a "machine gun" as follows:

> The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.[1]

---

[1] As my dissenting colleagues point out, *see* Walker Op. 2 n.1; *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 44–45 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part), Congress amended the definition of machine gun in 1968. The amendment deleted the words "or semiautomatically" from the above-quoted sentence. Pub. L. No. 90-618, 82 Stat. 1213, 1231 (1968). The 1968 Act also added a second sentence specifying that "the frame or receiver" of the weapon, or "any combination of parts designed and intended" to convert a weapon into a machine gun or to assemble a machine gun, also qualified as a machine gun. *Id.* The legislative history clearly indicates that Congress did not consider the deletion of "or semiautomatically" to be a substantive change, because Congress stated "[t]his subsection defines the term 'machinegun' and the first sentence is existing law." S. Rep. No. 90-1501, at 45 (1968) (section-by-section analysis of the bill); *see also*

3

Pub. L. No. 73-474, § 1(b), 48 Stat. 1236, 1236 (1934). Petitioners and my dissenting colleague complain that the panel's conclusion that "a 'single function of the trigger' is best understood as a 'single pull of the trigger' and 'analogous motions'" is somehow novel. Pet. at 11 (quoting *Guedes*, 45 F.4th at 315, 317); Walker Op. 6–7. Not so.

Both the Senate and House reports on the National Firearms Act explained that the bill "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and *by a single pull of the trigger*." S. Rep. No. 73-1444, at 2 (1934) (quoting H.R. Rep. No. 73-1780 (1934)) (emphasis added). Immediately following the Act's passage, the Treasury Department published a letter ruling defining a machine gun as "a semiautomatic pistol or an autoloading pistol when converted into a weapon which shoots automatically, that is, one capable of discharging the entire capacity of its magazine *with one pull of the trigger*. . . ." Rev. Rul. XIII-38-7035, S.T. 772, 13-2 C.B. 433–34 (Jul.-Dec. 1934) (emphasis added).[2]    Thus,

*Federal Firearms Legislation, Hearings before the Senate Judiciary Committee, Juvenile Delinquency Subcommittee*, 90th Cong. 135 (1968) (quoting from section-by-section analysis submitted to Congress by Hon. Sheldon S. Cohen, Commissioner of Internal Revenue) ("This subsection defines the term 'machine gun' and the first sentence is existing law."). Accordingly, attempts to rely upon the 1968 deletion of "or semiautomatically" to narrow the reach of the text, *see* Pet. at 12; Walker Op. 8–9; *Guedes*, 920 F.3d at 44–45 (Henderson, J., concurring in part and dissenting in part), are without merit.

[2] This 1934 letter ruling was not cited in the briefing or in the panel opinion. I found it when performing subsequent research after the rehearing petition was filed.

"single function of the trigger" was construed as equivalent to "single pull" of the trigger at the outset.

Significantly, the 1934 Treasury letter ruling defines machine gun consistent with how a bump stock operates, because it is a device that is "capable of discharging the entire capacity of its magazine with one pull of the trigger." 13-2 C.B. at 434. As the District Court found, "[o]nce the shooter pulls the trigger, a bump stock harnesses and directs the firearm's recoil energy, thereby forcing the firearm to shift back and forth, each time 'bumping' the shooters stationary trigger finger. The shooter is thus able to reengage the trigger *without additional pulls of the trigger*." *Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 520 F. Supp. 3d 51, 58 (D.D.C. 2021) (emphasis added). Petitioners did not properly challenge the predicate for these factual findings when proposed by the government at the summary judgment stage, and they did not challenge the District Court's factual findings as clearly erroneous on appeal. *See Guedes*, 45 F.4th at 317–18. Petitioners' attempt to wriggle out of these findings at the rehearing stage, *see* Pet. at 10 n.2, comes way too late and is at least doubly forfeited.

I refer to this 1934 letter ruling not because its interpretation is binding upon or must be deferred to by this Court. Instead, it bears mention because it refutes Petitioners' contention that the 2018 bump stock rule "contradicts eight decades of interpretations by the Treasury Department and the ATF." Pet. at 15; *see also Guedes*, 920 F.3d at 46–47 (Henderson, J., concurring in part and dissenting in part). To the extent the relative gravitas of the various letter rulings is relevant to the debate, I note that the 1934 letter ruling was public, issued by the Acting Commissioner of Internal Revenue, and approved by the Secretary of the Treasury, s*ee* 13-2 C.B. at 440, whereas the bump stock letter rulings issued

between 2008 and 2017 cited by Petitioners and the dissent were all private, rather than public, and issued by subordinate Bureau officials, *see* Administrative Record ("A.R.") 424–84. *See* 26 C.F.R. § 601.601(d)(2)(v)(d) ("Revenue Rulings published in the Bulletin do not have the force and effect of [regulations], but are published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for that purpose. No unpublished ruling or decision will be relied on, used, or cited, by any officer or employee of the Service as a precedent in the disposition of other cases."). Further, the suggestion by Petitioners and the dissent that purchasers of bump stocks were entitled to rely on the 2008-2017 private letter rulings is wholly without merit. *See id.*; *see also McCutchen v. United States*, 14 F.4th 1355, 1368–70 (Fed. Cir. 2021), *cert. denied*, 143 S. Ct. 422 (2022) (holding that bump stock private letter rulings did not establish a property right because the Bureau's handbook, "which is public, states that a [firearm] classification provided by letter is 'subject to change if later determined to be erroneous,'" and also because the letter rulings were informal, unpublished, and not issued through rulemaking); *Hanover Bank v. Comm'r*, 369 U.S. 672, 686 (1962) ("[P]etitioners are not entitled to rely upon unpublished private rulings which were not issued specifically to them[.]").

Relatedly, the dissent's characterization of the 2018 Rule as Executive overreach ignores the constitutional and statutory context and exaggerates what happened here. Walker Op. 1, 10–16. As we have previously held, Congress explicitly gave the Secretary of Treasury "interpretative rulemaking power" in the National Firearms Act. *See Lomont*, 285 F.3d at 16 (citing 26 U.S.C. § 7805(a)). Thus, the statute, and the Executive's power to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, made it perfectly appropriate for the Bureau to issue a rule explaining what it believed the statute meant and

how it would enforce the law going forward. The 2018 Rule was not an extraconstitutional "power grab[]," Walker Op. 1, but rather a fitting response to many reasonable questions about the Executive's view of the scope of the statutory machine gun prohibition and how it would be enforced following a national tragedy. And while the Executive can pronounce its statutory interpretation consistent with the constitutional order, the judicial branch has the power and responsibility to render the authoritative interpretation of the statute. There is no constitutional crisis.

## II.

As the panel explained, "a 'single function' of the trigger is best understood as a 'single pull of the trigger' and 'analogous motions,' while automatically is best understood to mean a 'result of a self-acting or self-regulating mechanism.'" *Guedes*, 45 F.4th at 317. I will let the panel opinion speak for itself. I add only that the 1934 letter ruling, issued by the Commissioner and adopted by the Secretary, is consistent with the panel's interpretation, and thus corroborates that the panel interpretation is the best reading of the statute.

As the 1934 Cumulative Bulletin indicates, none other than Robert H. Jackson—as Assistant General Counsel of the Bureau of Internal Revenue—authored over two dozen regulations, letter rulings, and opinion letters that were published contemporaneously with the 1934 machine gun letter ruling. 13-2 C.B., *passim*. We do not know whether then-Mr. Jackson drafted or approved the 1934 machine gun letter ruling, though it is probable. But we do know that, a few years later, then-Justice Jackson warned that "if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact." *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson,

7

J., dissenting). The 58 people killed and approximately 500 wounded in Las Vegas by a shooter using bump stock devices behoove us to heed Justice Jackson's prescient admonition. Where we can employ tools of statutory interpretation to derive a reasonable interpretation of the statute, we should not find a "grievous ambiguity" to rule in Petitioners' favor pursuant to the rule of lenity. *Maracich v. Spears*, 570 U.S. 48, 76 (2013). One of the manufacturers of bump stocks bragged on its website, "Did you know that you can do full-auto firing and it is absolutely legal?" A.R. 840. We do not have to "guess as to what Congress intended," *Maracich*, 570 U.S. at 76, to determine whether text prohibiting "any weapon which shoots . . . automatically more than one shot, without manual reloading, by a single function of the trigger," 26 U.S.C. § 5845(b), covers a device that concededly replicates "full-auto firing," A.R. 840. "There is no war between the Constitution and common sense." *Mapp v. Ohio*, 367 U.S. 643, 657 (1961).

The petition for rehearing en banc is properly denied.

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting from the denial of rehearing en banc: For the reasons explained at the preliminary injunction stage in my separate panel opinion, which is hereby incorporated by reference thereto, *Guedes v. ATF*, 920 F.3d 1, 35–49 (D.C. Cir. 2019) (Henderson, J., concurring in part and dissenting in part), I dissent from the denial of rehearing en banc. And I echo Judge Walker's view that the case presents "question[s] of exceptional importance." D.C. Cir. R. 35(a)(2); *see infra* at 11–16 (Walker, J., dissenting from denial of rehearing en banc).

WALKER, *Circuit Judge*, dissenting from the denial of rehearing en banc: Congress recently considered at least five bills restricting or banning bump stocks. None passed. Yet bump stocks are illegal anyway. That's because the Bureau of Alcohol Tobacco, Firearms, and Explosives stepped into Congress's shoes and criminalized owning a bump stock.

Like other power grabs by impatient agencies, the Bureau decided Congress was taking too long. So it relied on a misguided reading of an old statute to solve the problem itself. According to the agency, that old statute had banned bump stocks all along.

The Bureau's overreach is troubling because it turns law-abiding Americans into criminals. Before the Bureau issued its rule, it spent a decade telling the public that bump stocks were legal. After the rule, bump-stock owners who relied on that advice are felons if they do not discard their devices.

Congress makes the laws — especially the criminal laws. The executive branch does not. To reestablish that principle, I would grant rehearing en banc.

## I

Relying on a strained reading of an old statute, the Bureau banned bump stocks. But no statute gives it that authority.

## A

The Firearms Owners' Protection Act of 1986 "effectively banned private ownership of machine guns." *Guedes v. ATF*, 920 F.3d 1, 35 (D.C. Cir. 2019) (*Guedes I*) (Henderson, J., concurring in part and dissenting in part) (citing Pub. L. No. 99-308, 100 Stat. 449). The Act made it a crime to "transfer or possess a machinegun" that was not "lawfully possessed" before 1986. 18 U.S.C. § 922(o)(1), (2)(B). To define

"machinegun," the Act drew on a long-standing definition in the National Firearms Act of 1934, as amended in 1968: a "machinegun" is a "weapon which shoots . . . automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b).[1]

For decades, the government interpreted that definition to exclude guns that fire only a single bullet each time the trigger moves. In 1955, for instance, the government said that a crank-operated gatling gun was not a machinegun because it was "not designed to shoot automatically . . . more than one shot with a single function of the trigger." Rev. Rul. 55-528, 1955 WL 9410. The crank just let the user fire the gun more quickly.

Fast forward to 2008. The Bureau relied on similar reasoning to find that a bump stock did not turn a semiautomatic gun into a machinegun. A bump stock replaces the standard stock of a semiautomatic rifle. When a shooter fires the rifle, it naturally recoils backwards into the shooter's shoulder. The bump stock captures that recoil energy, returning the rifle forward. When that happens, the trigger bumps into the shooter's stationary trigger finger, firing the weapon. The rifle will keep firing as long as the shooter keeps forward pressure on the bump stock. In "ten letter rulings between 2008 and 2017," the Bureau said "bump-stock-type devices" did not "qualify as machineguns" because they do not work "automatically." 83 Fed. Reg. 66,514, 66,517 (Dec. 26, 2018). Instead, they require "the maintenance of pressure by the shooter" to work. *Id.* at 66,518.

---

[1] The Act originally defined a machinegun as "any weapon which shoots, or is designed to shoot, automatically *or semiautomatically*, more than one shot." Pub. L. No. 73-474, 48 Stat. 1236 (emphasis added). The Gun Control Act of 1968 deleted the words "or semiautomatically." Pub. L. No. 90-618, 82 Stat. 1231.

Then in 2017, a gunman using a bump stock killed 58 people and wounded 500 others in Las Vegas. In the wake of that tragedy, Congress considered legislation to ban or restrict bump stocks. *See, e.g.*, H.R. 4168, 115th Cong. (2017); S. 1916, 115th Cong. (2017); S. 2475, 115th Cong. (2018); H.R. 4594, 116th Cong (2019); H.R. 5427, 117th Cong. (2021). Yet for better or worse, those bills did not become laws.

In our system of separated powers, that should have been the end of the story. Congress alone makes the laws. U.S. Const., Art. I. And Congress has not yet decided to ban bump stocks. If that is bad policy, Americans can show their disapproval at the ballot box by voting out their representatives.

But instead of letting the democratic process play out, the Bureau took matters into its own hands. While legislative efforts were ongoing, the Bureau issued a rule reinterpreting the statutory definition of "machinegun" to include bump stocks. 83 Fed. Reg. at 66,514. In doing so the Bureau reversed the interpretation of the statute it had stuck to for a decade. *Id.* at 66,517.

The Bureau also went *further* than some of the proposals Congress rejected. For instance, the proposed Closing the Bump-Stock Loophole Act would have required bump-stock owners to "register" their devices with the Bureau. H.R. 4168, 115th Cong. (2017). The Bureau eschewed all such half measures; its reinterpretation of the statute banned bump stocks altogether.

After the Bureau's interpretive about-face, Damien Guedes and several other plaintiffs brought a challenge under the Administrative Procedure Act. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 520 F. Supp. 3d 51 (D.D.C. 2021). Guedes argued that the Bureau lacked statutory

4

authority to ban bump stocks because they are not covered by the National Firearms Act's definition of "machinegun." *Id.* at 61. The district court rejected that argument and a panel of this court affirmed. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 317 (D.C. Cir. 2022) (*Guedes II*). Guedes now petitions for rehearing en banc.

B

The Bureau's rule misreads the National Firearms Act. Under the Act, a "machinegun" must "shoot[ ] . . . automatically more than one shot . . . by a single function of the trigger." 26 U.S.C. § 5845(b). A bump stock neither lets a shooter "automatically [fire] more than one shot" nor lets him do so by "a single function of the trigger." *Id.* So Congress's ban on machineguns unambiguously does not cover them.

1

Start with the phrase "single function of the trigger."

In 1934, when the statutory definition of "machinegun" became law, "function" meant the "natural and proper action" of a thing. *Webster's New International Dictionary* 876 (2d ed. 1933). Something's "function" was "[t]he special kind of activity proper to [it]; the mode of action by which it fulfills its purpose." 4 *Oxford English Dictionary* 602 (1933); *see also Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (courts should "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute" (cleaned up)).

So here, we must ask whether the "natural and proper action" of the trigger lets a rifle modified by a bump stock fire "more than one shot." 26 U.S.C. § 5845(b). It does not. When

shooting with a bump stock, only one shot fires each time the trigger moves. *See Guedes II*, 45 F.4th at 320 ("a bump stock device[ ] fires only one round with each mechanical movement of the trigger"). "The trigger . . . must necessarily 'pull' backwards and release the rifle's hammer . . . every time that the rifle discharges . . . . The rifle cannot fire a second round until both the trigger and hammer reset." *Aposhian v. Barr*, 958 F.3d 969, 995 (10th Cir.) (Carson, J., dissenting). Every shot requires a new movement of the trigger. If a gun fitted with a bump stock fires *more* than one round with a single movement of the trigger, it has malfunctioned.

The Bureau avoids that conclusion by rewriting "single function of the trigger" as "single *pull* of the trigger." 83 Fed. Reg. at 66,514, 66,518. Because a shooter firing with a bump stock need pull the trigger only once to start firing, the Bureau says that a bump stock counts as a machinegun under the statute. *Id.* at 66,514. After that initial pull, the bump stock repeatedly pushes the trigger into the shooter's stationary finger, firing additional shots. No additional pulls are required.

But the Bureau provides scant evidence to support its edit of the statute. Relying on a footnote from *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994), and a snippet of testimony from a congressional hearing, the Bureau claims that its interpretation is "consonant with the statute and its legislative history." 83 Fed. Reg. at 66,518 (quoting *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009)).

That is a flimsy foundation for reading the word "function" to mean something different. True, in *Staples*, the Supreme Court described an automatic weapon as one that "fires repeatedly with a single pull of the trigger." 511 U.S. at 602 n.1. But it did so in a footnote describing background facts, not when definitively interpreting the National Firearms Act. *See*

*United States v. Olofson*, 563 F.3d 652, 657 (7th Cir. 2009) (the *Staples* footnote "was providing a glossary for terms frequently appearing in the opinion" and not "interpreting a statute").

That leaves the agency with a solitary sentence from a committee hearing on the 1934 National Firearms Act to support its interpretation. There, the National Rifle Association's then-president testified that a machinegun is a weapon "capable of firing more than one shot by a single pull of the trigger, a single function of the trigger." 83 Fed. Reg. at 66,518 (quotation marks omitted). But legislative history is notoriously unreliable. The text of the statute controls, not a throw-away line cherry-picked from the 170-page record of a congressional hearing. *See National Firearms Act: Hearings Before the Committee on Ways and Means*, H.R. 9066, 73rd Cong. (1934); *see also Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) (warning against "divin[ing] messages from congressional commentary").[2]

Perhaps realizing that the agency's argument is weak, the panel offered a different explanation for why "function" really means "pull." It reasoned that "function" means an "activity; doing; [or] performance," and "the shooter's pull is the single

---

[2] To the agency's evidence, Judge Wilkins's eagle-eyed research adds a 1934 tax ruling. Wilkins Op. 3. There, the Treasury said a "semiautomatic" or "autoloading" pistol becomes a "machine gun" when converted to "discharg[e] the entire capacity of its magazine with one pull of the trigger." Rev. Rul. XIII-38-7035, S.T. 772, 13-2 C.B. 433–34 (Jul.-Dec. 1934). True, that ruling is probative of the original public meaning of the Act. But tax rulings can be mistaken, even when they may have been written by Robert Jackson. *Cf.* Horace, *Ars Poetica* ("sometimes even good Homer nods off"). And here, for the reasons explained above, strong textual clues counsel against equating, as the Treasury did, "single function of the trigger" with "one pull of the trigger."

'activity' or 'performance' of the trigger that causes the gun to shoot automatically more than one shot." *Guedes II*, 45 F.4th at 315 (quotation marks omitted). But that focuses on the reason why the trigger moves, not, as the statute requires, on how often the trigger moves. That gets it backwards. The statute is indifferent about *why* the trigger moves — pull, bump, or otherwise — it looks only to how many shots are fired each time the trigger moves.

Plus, reading "function" as "pull" ignores the fact that Congress knows how to write "single pull of the trigger" when it wants to. Indeed, the National Firearms Act's definition of "rifle" uses that phrase. *See* 26 U.S.C. § 5845(c) (a rifle "fire[s] only a single projectile through a rifled bore for each single pull of the trigger"); *see also* 18 U.S.C. § 921(a)(5) (a shotgun "fire[s] through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger"). Yet the panel's interpretation of "function" gives no meaning to Congress's decision to use "single function" in one place and "single pull" in another. *Cf.* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) (courts should pay attention to meaningful variation in statutory language).

Even if the agency is right that "function" means "pull," it is *still* not clear that the statute covers bump stocks. The agency claims, and the panel accepts, that a "pull" of the trigger can include other "analogous" ways of "activat[ing] . . . a trigger" like a "push, or some other action." 83 Fed. Reg. at 66,515, 66,518 n.5; *see also Guedes II*, 45 F.4th at 311 (the statute covers a "single pull of the trigger and analogous motions."). Here, it is undisputed that a bump stock works by bumping the trigger into the shooter's stationary finger, thus firing the weapon. So why does that not count as a motion that is analogous to a "pull of the trigger"? The agency has no answer.

And if a bump *is* analogous to a pull, then rifles fitted with bump stocks are not machineguns under the National Firearms Act. Each bump, like each pull, fires one bullet. A single action never causes the rifle to fire more than one shot.

2

A bump stock is not a "machinegun" for a second reason. A machinegun must "shoot[ ] *automatically* more than one shot." 26 U.S.C. § 5845(b) (emphasis added). A bump stock does not.

In 1934, "automatically" meant "having a self-acting or self-regulating mechanism," *Webster's New International Dictionary* 187 (2d ed. 1934), or "[s]elf-acting under the conditions fixed for it, going of itself." 1 *Oxford English Dictionary* 574 (1933).

A mechanism cannot be self-acting or self-regulating if it requires user input to keep working. And a bump stock needs constant input from the shooter if a gun is to keep firing. He must keep forward pressure on the bump stock for it to work. If he does not, the weapon will fire only one shot. So firing with a bump stock requires "skill[ ] and coordination," as explained in comments on the Bureau's proposed rule. 83 Fed. Reg. at 66,531–32.

Rather than grappling with that inconvenient fact, the Bureau largely ignores it. It says that a bump stock lets a shooter fire more than one shot automatically because "the device harnesses the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger." *Id.* at 66,519. That is true enough. But it does not account for the undisputed fact that a shooter must maintain "forward pressure

on the barrel" for a bump stock to let him fire more than one shot. *Guedes II*, 45 F.4th at 318. And tellingly, the Bureau reached a different conclusion for years, finding that bump stocks require "multiple inputs by the user for each successive shot." Letter from Richard W. Marianos, ATF Assistant Director Public and Governmental Affairs, to Rep. Ed Perlmutter, at 1–2 (Apr. 16, 2013), https://perma.cc/46VL-J88S.

Even worse, the agency's reading of the statute elides an important distinction between automatic and semiautomatic guns. In 1934, the "difference between an 'automatic' and a 'semiautomatic' gun depended on whether the shooter played a manual role in the loading and firing process." *Guedes I*, 920 F.3d at 45 (Henderson, J., concurring in part and dissenting in part). A semiautomatic gun is one "in which part, but not all, of the operations involved in loading and firing are performed automatically." *Id.* (quoting *Webster's New International Dictionary* 187 (2d ed. 1934)). By contrast, after the first shot is fired, an automatic gun reloads and fires automatically, so long as the shooter keeps his finger on the trigger. *Id.* A gun modified by a bump stock works *semi*automatically: the shooter plays a manual role in the firing process because he must keep constant pressure on the bump stock.

If Congress had wanted to call a semiautomatic weapon a machinegun, it could have. In fact, in 1934, it did. Originally, the National Firearms Act defined machinegun to cover both guns that fire more than one shot "semiautomatically" and those that do so "automatically." Pub. L. No. 73-474, 48 Stat. 1236. But in 1968, Congress deleted the word "semiautomatically" from the statutory definition. Pub. L. No. 90-618, 82 Stat. 1213. The Bureau's rule essentially writes it back in.

3

To make matters worse, the Bureau's rule has no grandfather clause. That means that hundreds of thousands of law-abiding Americans who *legally* bought bump stocks before 2018 now possess *illegal* property. What are they to do? According to the Bureau, they should "destroy or abandon their devices." 83 Fed. Reg. at 66,530.

That suggestion is startling. For one thing, many bump-stock owners purchased their devices in reliance on the Bureau's assurance that they were not prohibited. *See* 83 Fed. Reg. at 66,517. For another, when Congress passed its ban on machineguns in 1986, it grandfathered in "machinegun[s] that w[ere] lawfully possessed before" the ban became effective. 18 U.S.C. § 922(o)(2)(B). It is hard to imagine that a Congress that sought to *protect* lawful gun owners when it passed the ban would have sanctioned the Bureau's subsequent bait and switch.

\* \* \*

To sum up, a gun fitted with a bump stock is not a machinegun because it does not automatically fire more than one shot each time the trigger moves.

In reaching that conclusion, I join other judges who have persuasively explained why the Act does not ban bump stocks. *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc); *Guedes I*, 920 F.3d at 35 (Henderson, J., concurring in part and dissenting in part); *Gun Owners of America v. Garland*, 19 F. 4th 890, 910 (6th Cir. 2021) (en banc) (Murphy, J., dissenting); *Aposhian v. Wilkinson*, 989 F.3d 890, 896 (10th Cir. 2021) (Tymkovich, C.J., dissenting from vacatur of en banc order).

11

II

If this were an ordinary case about statutory interpretation, I would not call for rehearing en banc, even if I disagreed with the panel's analysis. En banc review is reserved for "question[s] of exceptional importance." D.C. Cir. R. 35(a)(2).

But the bump stock ban is not ordinary. It's the source of a circuit split. It's the product of an agency's impatience with Congress. And it's an affront to 800 years of Anglo-American legal history restricting the executive's power to create new crimes.

In short, even in an era of aggressive executive rulemaking, the bump stock ban is a bridge too far.

A

En banc rehearing is often appropriate when a panel opinion conflicts with other circuit-court decisions. *Sweet Home Chapter of Communities for a Great Oregon v. Babbitt*, 30 F.3d 190, 195 (D.C. Cir. 1994) (Silberman, J., dissenting from denial of rehearing en banc) ("[T]he issue would seem of sufficient importance, particularly in light of the circuit split."); *cf.* D.C. Cir. R. 35(b)(1)(B) (litigants should flag circuit splits in their en banc petitions).

Here, circuits are split on the best reading of the National Firearms Act's definition of "machinegun."

The Fifth and Sixth Circuits have held, as I would, that the Act does not let the Bureau ban bump stocks. *See Cargill*, 57 F.4th at 447; *Hardin v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 2023 WL 3065807 (6th Cir. 2023). The Tenth

12

Circuit upheld the Bureau's rule, as did this Court. *Aposhian*, 958 F.3d at 989; *Guedes II*, 45 F.4th at 310.

B

Two further factors weigh in favor of reconsideration en banc.

1

The bump-stock ban is a glaring example of an increasingly common story:

1. Congress considers a highly controversial solution to a modern problem that attracts great public attention.

2. Despite that attention, Congress does not pass legislation addressing it.

3. The executive then finds within an old statute the power to address the problem that Congress did not.

That is also what happened with student loan forgiveness. *Compare* H.R. 6800, 116th Cong. (2020) *with Loan Forgiveness Fact Sheet*, White House (Aug. 24, 2022). And the COVID vaccine mandate. *NFIB v. OSHA*, 142 S. Ct. 661, 662 (2022). And the COVID eviction moratorium. *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485, 2486 (2021). And an attempted nationwide shift away from coal-fired power stations. *West Virginia v. EPA*, 142 S. Ct. 2587, 2614 (2022). And efforts to build a wall at our southern border. *See* Proclamation 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) (declaring an emergency at the southern border to get more funding than Congress had appropriated). And net neutrality. *United States Telecom Association v. FCC*, 855 F.3d 381, 476 (D.C. Cir. 2017) (Kavanaugh, J, dissenting from denial of rehearing en banc) ("Congress has debated net neutrality for

many years, but Congress has never enacted net neutrality legislation or clearly authorized the FCC to impose common-carrier obligations on Internet service providers.").

The point is not that any of those policies is good or bad. The point is that the executive branch is acting when Congress does not. That intrudes on Congress's constitutionally-assigned role and disincentivizes it from legislating in the future. Why would Congress bear the political costs of passing laws when it can let bureaucrats shoulder them instead? *See* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2255–56 (2001) (Congress sometimes enacts "open-ended grants of power" in order to "pass on to another body politically difficult decisions").

I will not rehash here all the reasons why lawmaking by the executive is problematic. I've written about it before. *American Lung Association v. EPA*, 985 F.3d 914, 996–97 (D.C. Cir. 2021) (Walker, J. concurring in part and dissenting in part), *overruled by West Virginia*, 142 S. Ct. at 2614. So have many of our nation's finest judges and scholars. *See, e.g.*, *Baldwin v. United States*, 140 S. Ct. 690, 691 (2020) (Thomas, J., dissenting from denial of certiorari); Steven G. Calabresi et al., *The Rise and Fall of the Separation of Powers*, 106 Nw. L. Rev. 527, 545–46 (2012). And Madison before them. *The Federalist* No. 48 (J. Madison). And Montesquieu before him. 1 Montesquieu, *The Spirit of the Laws* 151–62 (Thomas Nugent trans. 1777).

2

The Bureau's rule turns law-abiding bump-stock owners into criminals. But the Anglo-American legal system has long restricted the executive branch's power to create new crimes. Crimes are made by legislation, not executive fiat.

14

That principle has its roots in Magna Carta. After King John used "summary process" to "arrest and imprison[ ]" Englishmen on "administrative order[s]," English Barons forced him to agree to a new set of limits on his power. J.C. Holt, *Magna Carta* 276 (3d ed. 2015). Chief among those limits was a commitment that "[n]o free man shall be arrested or imprisoned . . . except by the lawful judgment of his peers or *by the law of the land*." *Magna Carta*, Ch. 39 (1215). After 1215, the King could not punish an Englishman "without the application of general rules to the case by a tribunal of [his] peers." Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1682 (2012). Those "general rules" were the "law of the land," the "standing law that governed all of the King's subjects in England." *Id.* No longer could the King impose criminal punishment whenever it suited his whims.

Hard-won by the English Barons, that right was cherished by the American colonists. It was their inheritance as Englishmen. And when they enumerated the limits of a central government in their new nation, the founders guaranteed that "life, liberty, or property" may not be taken "without due process of law." U.S. Const. Amend. V.

That means that "our Government [must] proceed . . . according to written constitutional and statutory provisions . . . before depriving someone of life, liberty, or property." *Nelson v. Colorado*, 581 U.S. 128, 150 n.1 (2017) (Thomas, J., dissenting) (quotation marks omitted); *see also Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 28 (1991) (Scalia, J., concurring) (noting that the phrase "due process of law" meant "law of the land"). In other words, the executive branch may prosecute only those criminal offenses that Congress has authorized by law. The Due Process Clause "was a separation-

of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law." *United States v. Vaello Madero*, 142 S. Ct. 1539, 1545 (2022) (Thomas, J., concurring) (quotation marks omitted).

To Magna Carta's guarantee of due process, the Constitution added a second safeguard — an independent legislature, beholden in no way to the Executive. Article I's Vesting Clause makes clear that Congress alone has the "legislative power." U.S. Const. Art. I, § 1.

"Perhaps the most important consequence of th[at] assignment concerns the power to punish. Any new national laws restricting liberty require the assent of the people's representatives and thus input from the country's 'many parts, interests and classes.'" *Wooden v. United States*, 142 S. Ct. 1063, 1083 (2022) (Gorsuch, J., concurring) (quoting *The Federalist* No. 51 (J. Madison)). Indeed, since 1812, the Supreme Court has said that Congress alone defines crimes and fixes punishments. *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1812) ("The legislative authority of the Union must . . . make an act a crime [and] affix a punishment to it."); *see also United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.) ("[T]he power of punishment is vested in the legislative . . . department. It is the legislature . . . which is to define a crime, and ordain its punishment.").

Today, those safeguards are not what they used to be. In the early 1900s, Congress began to delegate open-ended powers to executive agencies. Kagan, *supra*, at 2255. And by the late 1940s, the Supreme Court would uphold any delegation if Congress provided an intelligible principle to guide the agency. *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *see also J.W. Hampton Jr. & Co. v. United States*,

276 U.S. 394, 409 (1928) (coining the "intelligible principle" phrase). Under the Supreme Court's light-touch nondelegation doctrine, it has upheld as a valid delegation a statute "endow[ing] the nation's chief prosecutor with the power to write his own criminal code governing the lives of a half-million citizens." *Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Gorsuch, J., dissenting); *cf. Touby v. United States*, 500 U.S. 160, 165–66 (1991) (it is an open question whether "something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions").

Whatever the merits of that development, one safeguard has not loosened. When Congress *does* delegate rulemaking authority, the executive branch must remain faithful to the statutory text. It may not use creative interpretations to grab for itself even more power. But the Bureau's rule does just that, stretching the text of the National Firearms Act to criminalize conduct that Congress has not.

\* \* \*

The day before the Bureau's rule, owning a bump stock was legal. The day after, it carries a ten-year prison sentence — all without Congress lifting a finger.

I would grant rehearing en banc to reestablish that the power to make crimes stays where the Constitution put it — with Congress.